ALEXIS DELAFOILE, ALEXANDER H. EBBES AND GARRET
ALLISON, PLAINTIFFS IN ERROR, v. THE STATE OF
NEW JERSEY, DEFENDANT IN ERROR.

Marshals of an association organized under "An act to authorize the form-
ation of associations for the more effectual prevention and detection
of crime," approved March 20th, 1878 (*Rev. Sup., p.* 815), having, on
a Sunday, peaceably entered an inn, afterward forced their way into
upper rooms (where they suspected that the law in respect to the sale
of intoxicating liquors was being violated) against the remonstrance
and resistance of the landlord and his wife and servants. They had
no warrant for the arrest of any person, and did not know that a crime
had been, or was being, committed. In forcing the stairs, they did
injury to the person of the landlord's wife, and were indicted and con-
victed for assault and battery. *Held,* that their act was not justified
by any authority conferred on them as marshals by the statute before
mentioned, and that they were properly convicted.

On writ of error to the Supreme Court.

The plaintiffs in error were indicted at the September Term,
1889, of the Bergen Oyer and Terminer, for assault and bat-
tery on one Hannah Collins, the wife of Thomas Collins, who
kept an inn and tavern called "The Octagon," at Fort Lee,
in the said county of Bergen. The defendants were members
and marshals of an organization called "The Riverside Law
and Order Society of the Township of Ridgefield." The
organization of that society was under an act of the legisla-
ture entitled "An act to authorize the formation of associations
for the more effectual prevention and detection of crime,"
approved March 20th, 1878. *Rev. Sup., p.* 815.

The cause was tried at the same term in the Quarter Ses-
sions, resulting in a conviction of the defendants. It was
removed by writ of error into the Supreme Court, and there
heard upon exceptions sealed at the trial. The Supreme
Court affirmed the judgment of conviction, and it is to review
that judgment that this writ of error is brought.

For the plaintiffs in error, *Eugene Stevenson*

For the defendant in error, *Abram D. Campbell.*

The opinion of the court was prepared by

KNAPP, J.   The record shows a conviction of the plaintiffs in error on an indictment found against them for assault and battery.   The bill of exceptions returned with the record shows acts of forcible injury to the person, committed by them, such as justify the conviction, unless the official character in which they assumed to act shields them from the ordinary legal consequences of a forcible injury to the person of another.   Their defence is, that they were clothed with the authority of constables, and, as such, possessed the right to enter the dwelling of another when they had reasonable ground to believe that in such dwelling the criminal law was being secretly violated in the unlawful sale of intoxicating drink; that as such officers, when in any part of such dwelling, by the license of the owner, their further right was to force their way against the will of such owner into any other part of such building in search of the suspected wrong-doing.

The question is, and the only one possessed of any substance, whether such officer is clothed with authority to the extent claimed for these defendants.

That the defendants, in virtue of their offices, possessed the powers and authority of constables is not denied.

The act under which they are appointed provides, that " all the powers of constables in criminal cases shall be possessed and exercised by them, and that they shall have power and authority to arrest any person found within the limits of said county who shall have violated any law of this state within the county, or who shall have willfully interfered with the peace and good order of the county, and the said marshal shall arrest every such person without warrant and endorsement and bring him or her, as soon as conveniently can be, before a magistrate," &c.

This legislation, and their appointment under it, undoubtedly conferred upon them the common law powers and authority of constables, and the usual powers exercised by officers of police.

Has one so endowed with public authority the right by force against the will of the owner resisting him to pass through any part of a dwelling on the mere belief, however well grounded, that the criminal law is being violated, and that not in a way to constitute a breach of the peace?

The parties were not armed with any warrant for the arrest of any person, therefore, their justification is not under acts done in execution of process. But the powers of these officers are not limited to the mere execution of process. The office was originally instituted for the better preservation of the peace, and a constable has the right, under his common law powers in divers cases, to arrest offenders without warrant. Thus, he is justifiable, without warrant, in arresting persons directly charged with felony, although it should afterward appear that no felony had actually been committed; and where a felony has been committed he is justified in making arrest without warrant, provided he acts in good faith upon such information as amounts to a reasonable and proper ground of suspicion. If he has reasonable cause to suspect that a felony has been actually committed, he is justified in arresting the parties suspected, although it afterwards appear that no felony has been committed; he may also arrest an offender, without warrant, for treason, felony, breach of the peace and some misdemeanors when committed in his view. 2 *Bac. Abr., tit. "Constable;" Hale P. C.* 587; *Beckwith* v. *Philby,* 6 *Barn. & C.* 635.

He is not only empowered to part an affray in his presence, but he is bound at his peril to do so if possible, and he may carry the persons engaged in it before a justice of the peace in order to their finding sureties to the peace, and to answer for their offences. If the affray be in a house, the constable may break open the doors to preserve the peace; and if the affrayers fly to the house and he freshly follow, he may break open

the doors to take them without warrant.    *Hale P. C.* 92,. 135.

But he cannot, without a warrant, arrest a man for an affray or breach of the peace out of his view unless it embrace a felony.

This subject is fully discussed in *Whart. Cr. L.*, §§ 5–8, and the cases are there collected.

ꞁ The boundaries of this official power seem to be clearly defined and distinct, and definite limits placed upon its exercise.

No case or text-writer asserts of this office the power to go into or through a private house unbidden by the owner save it be in the execution of criminal process, or where there is a well-founded belief of crime and the officer goes in pursuit of the criminal, or where in such house there is evidence that a felony or breach of the peace is being committed.

No one in this country, I think, before this case, ever asserted the right of a public officer to go through the private apartments of a family, against the will of the owner, to search for the existence of evidence of an infraction of a public law. Such a right, if it existed, would, in my judgment, create more public disorder than it could by any possibility repress.

It is said, however, that admitting that such a right does not inhere in these officers under the doctrine of the common law, nor general statutes controlling the subject, that in this case there is such broad and extended power given that it embraces the right that these parties set up.

Before it should be held that these officers, or any others acting in a ministerial capacity, or as conservators of the peace, are clothed with a power so comprehensive, the words of the law from which it is supposed to be derived should be such as to admit of no other possible construction. When such a law appears it will be time enough to consider whether or not it infringes upon those fundamental rights of personal security and private property lying at the very foundation of organized government.

The act invoked in support of this claim of the plaintiffs in error does not, in my judgment, go any way toward the maintenance of their position. First, they are given the rights and powers of constables in criminal cases. These rights and powers are well defined, and, as has been shown, embrace within them no such claim. Next, they are given power to arrest persons who have violated any law of this state within the county, or who have willfully interfered with the peace and good order of the county, and then proceeds : "And the said marshal shall arrest every such person without warrant and endorsement, and bring him or her, as soon as conveniently can be, before some person exercising the duties of justice of the peace in criminal cases, to be dealt with according to law."

In my judgment, this act, when properly construed, will be found not to have extended the power of these marshals beyond those that are ordinarily exercised by other peace officers of the state. It is not to be presumed that the legislature has done so, or intended to do so, and made exceptional provisions in favor of this peculiar class.

Who are they to arrest ?

Persons found within the limits of the county who shall have violated any law of this state within the county.

What sort of a law is here intended as having been violated ?

It is a violation of law to commit a trespass upon one's land ; the driving a wagon over the public highway of a less width than the statute demands is the violation of a law ; to pursue any worldly business or pleasure, or traveling on the first day of the week, commonly called Sunday, is the violation of a law of this state. Is it this class of laws for the violation of which these officers are authorized to take up and arrest without warrant ?

Clearly not. It is the violation of some criminal law that is intended.

And how are these officers to know that the law has been violated?   Because the law must have been violated in order that they may arrest.

They have no power to take testimony—they do not sit as committing magistrates.   How, then, can they know it? Only by its having taken place in their presence.   In cases of this kind, the constable has power to arrest for an offence committed against the public law in his presence, provided it is, in other language of the act, "an act that interferes with the peace and good order of the county."   That it is to be a criminal act that interferes with the peace and good order of the county is manifest from the further provision of the law that the offender is to be taken immediately before a justice of the peace having jurisdiction in criminal cases, there to be dealt with according to law.

The whole frame of this section of the act plainly shows that the legislature intended to express the possession of that degree of authority which, in common understanding and under the doctrines of the common law, is possessed and exercised by these officers.   It was not intended to confer upon them any such extraordinary powers.

If the words are to be taken in their broad scope, they embrace every act that is violative of law, whether the redress for such act be of a civil or of a criminal nature.   It would be absurd to yield to any such notion.

It is said that the plaintiffs in error went in to make an arrest for a breach of the criminal law.   But what breach of the criminal law was it for which they meant to arrest the guilty party?   They did not know that the law was violated. At best, it was a mere suspicion.   And while they say they went in with the purpose of arresting any person that they might find violating the law, it would be an abuse of terms to say that their purpose in entering was to arrest a criminal. They knew of none such.   Beyond mere suspicion, they were ignorant of any criminality.

To cast aside all disguise of words, their purpose was to hunt through this house looking for evidence to justify their

suspicion, and this against the will of the owner and against his resistance. This they had no right to do, and if they attempted it by force, and in doing so committed any violence against the person of the owner, or of those acting in his interest, they were undoubtedly guilty of criminal assault.

There is no pretence that, previous to their act of violence, there was any breach of the peace, noise or turbulence, nor was the person of any threatened or endangered.

Their power to arrest without warrant, where the public peace and good order of the county are interfered with, did not exist.

The antitheses of public peace and order are violence and turbulence.

But it is said they went to abate a public nuisance. Whence did the power arise by which these officers could determine the fact of public nuisance, and upon such determination of their own, proceed to abate it? Public nuisances are subject of indictment, to abate which a public officer must have the judgment and order of the court.

No man is given the power, upon his mere individual judgment, to undertake to so redress a public wrong.

There is nothing in the case tending to show a right, as private citizens, to abate the alleged nuisance under the well settled doctrine on that subject. *Brown* v. *DeGraff*, 21 *Vroom* 409.

Unless we are willing to hold that the domicil of every citizen, against whom these officers have a suspicion, may be invaded by force and their houses ransacked to find evidence justifying their suspicion, their action in this case must be disapproved.

The judgment below is affirmed.

*For affirmance*—THE CHANCELLOR, DEPUE, GARRISON, MAGIE, VAN SYCKEL, BOGERT, BROWN, CLEMENT, SMITH, WHITAKER.  10.

*For reversal*—None

NOTE.—This opinion was found among the papers of the late Mr. Justice Knapp, to whom its preparation had been entrusted. It is known to his associates that he had intended to add some new matter to it. But it has been thought best to publish the opinion as it is, and to place in this note the matter which it is understood was intended to be added.

The closest parallel to the claim of plaintiffs in error, that a public officer may lawfully break open a house, or, being lawfully therein, may break into rooms to discover evidence of the commission of a crime, will be found in those cases which arose in England shortly before the separation of this country, respecting the publication of seditious libels in the "North Briton," "Monitor" and other periodicals. In those cases the secretary of state issued general warrants, directing the arrest of the authors and publishers of such libels (without naming them), and the search and seizure of their papers. Messengers, to whom the warrants were directed, arrested and confined a large number of persons, and broke into rooms and desks, examined and seized their private papers and delivered them to a clerk of the secretary of state. Many of those who were thus treated brought actions of trespass against the messengers and recovered substantial damages. Upon motions in arrest of judgment, or for a new trial or otherwise, questions involving the validity of such warrants, and the authority of messengers, were considered in the King's Bench and in the Common Pleas. *Money* v. *Leach*, 1 *W. Bl.* 555; *Huckle* v. *Money*, 2 *Wils.* 205; *Beardmore* v. *Carrington*, *Id.* 244; *Entick* v. *Carrington*, 19 *How. St. Tr.* 1070; *S. C.*, 2 *Wils.* 275; *Wilkes* v. *Wood*, 19 *How. St. Tr.* 1154.

In Money v. Leach, the King's Bench, without determining the question of the authority of the secretary of state to issue any warrant, decided that his warrant, not naming or particularly describing the person to be seized, was wholly void and sustained a verdict in favor of Leach, who had been arrested on such a warrant.

In Huckle v. Money, a similar warrant came in question, under which Huckle, a journeyman printer, had been arrested.

A verdict for exemplary damages was sustained in the Common Pleas, Lord Chief Justice Platt saying of the action of the jury: "I think they have done right in giving exemplary damages; to enter a man's house by virtue of a nameless warrant, in order to procure evidence, is worse than the Spanish inquisition."

In Entick v. Carrington, the warrant in question expressly directed the apprehension of Entick and also the seizure of his papers. In his action against the messengers, Entick confined his claim for damages to the trespass committed by breaking into his desks and boxes, and examining and seizing his papers. In the report of the case in the state trials, Lord Chief Justice Camden thus deals with the claim that a search in a suspected person's papers could be justified as a means of detecting offenders by discovering evidence: " Lastly, it is urged as an argument of utility that such a search is a means of detecting offenders by discovering evidence. I wish some cases had been shown where the law forceth evidence out of the owner's custody by process. There is no process against papers in civil causes. * * * In the criminal law, such a proceeding was never heard of. * * * It is very certain that the law obligeth no man to accuse himself, because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust, and it would seem that search for evidence is disallowed upon the same principle. There, too, the innocent would be confounded with the guilty."

The report of the same case, in 2 Wils. 275, contains the decision of the Common Pleas upon a special verdict and after two solemn arguments. It was determined by the whole court that there was no jurisdiction in the secretary of state to grant a warrant "to break open doors, locks, boxes and to seize a man and all his books, &c., in the first instance upon an information of his being guilty of publishing a libel."

From these cases, it is clear that the common law did not admit of the invasion of private property, even under color of

a warrant, for the purpose of procuring evidence of crime.   *A fortiori*, such an invasion, without warrant, was not justifiable.

It does not necessarily follow that the legislature may not, with proper restrictions, authorize such invasion of private property to procure evidence of crimes difficult otherwise to detect.   This question Justice Knapp, in his opinion, has distinctly reserved from decision.