219 N.J. Super. 12 (1987)
529 A.2d 1000
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JORGE HURTADO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 19, 1987.
Decided July 9, 1987.
*15 Before Judges MICHELS, SKILLMAN and LANDAU.
Peter M. Jacques, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Defender, attorney; Peter M. Jacques, of counsel and on the brief).
Leslie F. Schwartz, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General, attorney; Leslie F. Schwartz, of counsel and on the letter brief).
The opinion of the court was delivered by LANDAU, J.S.C. (temporarily assigned).
Jorge Hurtado appeals from the denial of his motion to suppress evidence. After his motion was denied, Hurtado pled guilty to unlawful possession of cocaine, and was sentenced thereunder.
On appeal, Hurtado urges:
POINT I
THE DETENTION OF THE DEFENDANT FOR FAILURE TO CARRY IDENTIFICATION AND FOR VIOLATION OF A MUNICIPAL LITTERING ORDINANCE CONSTITUTED AN UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT AND ARTICLE 1, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION, REQUIRING SUPPRESSION OF THE FRUITS OF THE INVENTORY SEARCH CONDUCTED INCIDENT TO THAT DETENTION.

*16 A. The Detention At The Scene And Conveyance To Police Headquarters Where The Defendant Was Placed In A Cell For Inability To Post Bail Constituted A Seizure Triggering Constitutional Protection.
B. The Seizure Of The Defendant Was Overly Intrusive And Thereby Unreasonable In Violation Of The Fourth Amendment And Article 1, Paragraph 7 Of The New Jersey Constitution.
POINT II
THE POLICE HAD NO AUTHORITY TO ARREST THE DEFENDANT, WITHOUT A WARRANT, FOR VIOLATION OF A MUNICIPAL ORDINANCE; THE SUBSEQUENT SEARCH CONDUCTED PRIOR TO PLACING THE DEFENDANT IN A CELL FOR INABILITY TO POST BAIL THEREFORE VIOLATED THE FOURTH AMENDMENT AND ARTICLE 1, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION, REQUIRING SUPPRESSION OF THE FRUITS OF THE INVENTORY SEARCH.
POINT III
THE VIOLATION OF A MUNICIPAL LITTERING ORDINANCE DOES NOT CONSTITUTE A "BAILABLE OFFENSE" FOR PURPOSES OF N.J.S.A. 2A:8-27; THEREFORE, THE INVENTORY SEARCH CONDUCTED PRIOR TO PLACING THE DEFENDANT IN A CELL FOR HIS INABILITY TO POST BAIL ON A LITTERING VIOLATION TRANSGRESSED THE FOURTH AMENDING VIOLATION TRANSGRESSED THE FOURTH AMENDMENT AND ARTICLE 1, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION REQUIRING SUPPRESSION OF THE TAINTED FRUITS OF THAT SEARCH.

FACTS
Hurtado and another male were observed by a Plainfield police officer walking back and forth on a block in Plainfield in a neighborhood known for muggings. Officer Paige of the Plainfield Police Force approached the pair, and inquired of the reasons for their presence in the area. Their response was that they were "taking a walk." During the discussion Hurtado dropped "a couple pieces of napkin." Paige cautioned him about the city ordinance against littering and Hurtado picked up the paper. Again, while Paige was still close to him, Hurtado threw down the napkin paper. At this point, Paige inquired as to his name and address and requested identification inasmuch as he was about to issue a summons for violation of the anti-littering ordinance.
Hurtado was unable to produce identification. The second male produced identification and was not detained, but Hurtado *17 was taken to the police station. At the station, identification procedures were set in motion and it was discovered that Hurtado had a record, including, according to Officer Paige, incidents of failure to answer other municipal summonses. At that time, Hurtado was out on bail awaiting imminent sentence on prior C.D.S. convictions.
According to Paige, upon learning of the "numerous of [sic] contempt of courts pending in his file," the Lieutenant in charge of the station house set $100 bail to secure his attendance for the summons under the municipal littering ordinance. Paige testified that initially Hurtado was "just detained, he wasn't arrested" for further identification, and that ordinarily he would give a city ordinance summons without taking someone to headquarters if they had an ID., such as a driver's license. For persons who had no ID, they were taken to headquarters, for identification purposes, before issuing the summons. When Hurtado was taken to the station house, his prior arrest cards, file and picture were located and his identification verified. Paige confirmed on cross-examination that he did not think there were any outstanding warrants at the time bail was set. Because Hurtado did not have the bail, he was placed in a holding cell, and an inventory search was conducted incident thereto. During the inventory a packet of cocaine was uncovered, which was the subject of the suppress motion.
When Hurtado was taken to the station, it developed that the name and address which he gave to the police officer on the street was accurate.
The history of Hurtado's prior failure to comply with summonses, as recounted by Officer Paige, was not disputed at the suppress hearing. His substantial adult record, dating to 1978 appears in the presentence report, now part of the record. That report discloses only one formal contempt of court charge, which had been dismissed. The transcript shows that the trial judge relied on the unrebutted testimony of Officer Paige as to Hurtado's prior failures to respond to summons.
*18 The trial judge rejected defense counsel's argument that Officer Paige had no authority to arrest the defendant for violation of a municipal ordinance without first obtaining a warrant, and dismissed his contention that less intrusive means should have been employed to corroborate the defendant's identity, such as taking him to his alleged residence. Having determined that it was proper to take Hurtado to the police station, the trial judge determined that setting bail was also proper. In consequence, the inventory search conducted prior to placing the defendant in a cell was approved, and the suppress motion denied.
Hurtado contends that his detention at the scene and subsequent conveyance and detention at police headquarters constituted an unreasonable seizure under U.S. Const., Amend. IV and N.J. Const., (1947), Art. I, ¶ VII. He argues therefore that the "fruit" uncovered by the subsequent inventory search should have been suppressed.
There is no dispute that Hurtado was involuntarily transported to police headquarters, although the State disputes that he was initially arrested, rather than detained.
Hurtado contends that even when an offense is committed in the presence of a police officer, the officer does not have power to arrest for violation of any municipal ordinance without first obtaining a warrant. In support, Hurtado cites State v. Scharfstein, 73 N.J. Super. 486, 489 (Cty.Ct. 1962), rev'd on other grounds, 79 N.J. Super. 236 (App.Div. 1963), aff'd, 42 N.J. 354 (1964). He says that "one is hard pressed to find an offense less innocuous or trivial" than discarding napkins on the street, a transgression for which the only sanction under Sec. 10:5-9 of the Plainfield Municipal Code is a fine not to exceed $250. Thus, he argues, even if temporary detention was appropriate, preliminary to issuing a summons, defendant's seizure was unreasonable after balancing the degree of intrusion and invasion of personal rights against the justification for initiating the intrusion. See United States v. Hensley, 469 U.S. *19 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); United States v. Place, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In the same vein, Hurtado also contends that the police had no authority to arrest him without a warrant merely for violation of a municipal ordinance. We disagree.
Inexplicably, Hurtado has failed to cite to this court N.J.S.A. 40A:14-152, the starting place for the determination of the authority of the arresting officer. That section provides that "the members and officers of a police department and force, within the territorial limits of the municipality, shall have all the powers of peace officers and upon view may apprehend and arrest any disorderly person or any person committing a breach of the peace." See also, N.J.S.A. 40:149-1 (Township Police). While the dictum in Scharfstein appears to have addressed the necessity for a warrant in connection with violations of municipal ordinances, its authority is dubious at best. Scharfstein was reversed for other reasons which made it unnecessary to consider the correctness of this dictum. Moreover, the cited dictum relies upon Mayor of Newark v. Murphy, 40 N.J.L. 145 (Sup.Ct. 1878), a case which discussed common law powers of arrest in England but which is not authority to preclude the arrest by a police officer of a person seen by that officer to commit any ordinance violation. The Murphy court construed a specific charter, prior to the express grant of arrest powers to police officers in statutes such as N.J.S.A. 40A:14-152. Indeed, as observed in State v. Smith, 37 N.J. 481 (1962), under the common law of arrest, a peace officer could arrest without a warrant, if the offense was committed in his presence, for misdemeanors involving or likely to involve breach of the peace. Misdemeanors, in context, were meant to be petty offenses, not tied to the source of the legislation, but which entailed "breaches of the peace." Although the Smith court rejected the words "breach of the peace" in relation to arrest as "vague and of doubtful utility," id. at 494, legislative enactment of L. 1971, c. 197 (N.J.S.A. 40A:14-152) statutorily revived *20 the "breach of the peace" verbiage. See also N.J.S.A. 40:149-1. Under these statutes, police power to arrest has been confirmed as to "any disorderly person" or "any person committing a breach of the peace." (Emphasis supplied) Thus, there is no limitation barring arrests for violations of municipal ordinances provided that such arrests fall within the New Jersey concept of a "breach of the peace," and the officer has observed the offense. We note that the Plainfield anti-litter provision is contained under the heading, "Morals and Conduct" in its Municipal Code.
Examples of the type of conduct in the presence of an officer which have specifically been deemed sufficient by the Legislature to render an offender subject to arrest may be found in statutes such as N.J.S.A. 23:2-8 (permits "summary arrest in cases of flagrant violation" of fish and game statutes), N.J.S.A. 40A:14-158 (authorizes warrantless arrests under municipal ordinances which prohibit litter by boaters affecting beaches, if observed by officers) and N.J.S.A. 53:2-1 (authorizes state police to arrest without warrant for "violations of the law committed in their presence ...").
As discussed in 3 Wharton's Criminal Law, (14th Ed. 1981), § 521 at 174, breach of the peace is a flexible concept encompassing, "the tranquility enjoyed by citizens of a community where good order reigns among its members." Whether or not a given act amounts to a breach of the peace is determined by considering the time when, the place where, and the circumstances under which, the act was committed. Violence is not an essential element of the offense. (Wharton, supra, § 522 at 175-176)
Thus, we reject the general proposition that there can be no lawful arrest in New Jersey for violation of a littering ordinance under the eyes of a police officer. The particular circumstances must be considered, including here, failure to heed the initial warning and absence of identification, which raise legitimate questions about whether the violations will *21 continue unless checked and whether a complaint-summons will be honored.
However, we agree with the State that in the present case, Hurtado's initial stop and detention fell short of formal "arrest." Having personally observed a violation of municipal ordinance, it was appropriate to warn the offender, and thereafter, to issue a complaint for the second violation. Incident thereto, identification was reasonably required before issuance of a summons-complaint. Absent identification, it is an acceptable and constitutional alternative to transport the offender to a police station for verification of identity. The Constitution does not require choice of a "less intrusive" alternative in such circumstances. Illinois v. Lafayette, 462 U.S. 640, 647, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65, 72 (1983). We note, as an indication of reasonable police action, that Hurtado's companion who possessed identification was not detained. We prefer not to second guess the alternative chosen by the police, which was not inherently unreasonable. See, United States v. Sharpe, 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605, 616 (1985).
Once at the police station, it was incumbent upon Officer Paige to comply with R. 3:4-1(c),[1] made applicable by R. 7:3-1 to all nonindictable offenses. Under this rule, the officer in charge is required to prepare a complaint-summons after identification procedures have been completed, and to "release that person in lieu of continued detention" unless it is determined that "any of the conditions set forth in paragraph (d) exist." R. 3:4-1(d)[1] enumerates six conditions, which include:
"(1) the person has previously failed to respond to a summons; and ...
(6) the officer has reason to believe the person will not appear in response to a summons."
*22 Objectively, Hurtado's prior failures to respond to summons, his lengthy past record, and the imminence of his sentencing in Superior Court for serious crimes, justified the determination by the officer in charge to exercise discretion under R. 3:4-1(c) and (d). Inasmuch as it was after 12:30 a.m., Hurtado would obviously then have been temporarily held in jail until he could be taken "without unnecessary delay before the nearest available committing judge ...," and it was reasonable for the officer in charge to set a modest bail pursuant to N.J.S.A. 2A:8-27 as collateral to insure Hurtado's appearance. The $100 bail was far less than the maximum fine provided by ordinance.
Prior to placing a defendant into custody, the police may inventory the personal items in his possession. Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). However, a person arrested for a minor offense must first be informed of his right to post collateral, and given an opportunity to do so prior to conducting an inventory search. U.S. v. Mills, 472 F.2d 1231 (D.C. Cir.1972); see 2 La Fave, Search & Seizure, (1978), § 5.3(d) at 331.
We disagree with Hurtado's argument that N.J.S.A. 2A:8-27 must be read to vitiate the powers of detention and arrest above discussed because "minor transgressions" are not "bailable." This statute deals with the power to set bail, not the power to arrest. Whether Hurtado's moment of technical arrest occurred on the street, or at the station after his record was disclosed, our Constitution requires that bail promptly be set for "[a]ll persons ...," except for certain capital offenses. N.J. Const., (1947), Art. 1, par. 11.
In the circumstances of this case, we hold that the inventory of Hurtado prior to his temporary incarceration pending court appearance was lawful and constitutional. Although it has not been argued, we have also considered carefully, and rejected, the possibility that the stop, detention, bail-set and inventory on the municipal ordinance charge were only a pretext to provide justification for an otherwise unconstitutional *23 invasion of Hurtado's personal rights. See, e.g., Gustafson v. Florida, 414 U.S. 260, 267, 94 S.Ct. 488, 492, 38 L.Ed.2d 456, 462 (1973) (Stewart, J., concurring). Even if the interest of the police was aroused by other suspicious conduct, we are satisfied that the facts objectively justified the actions taken. Cf., State v. Bruzzese, 94 N.J. 210, 219 (1983).
Affirmed.
SKILLMAN, J.A.D., dissenting.
I agree with the majority that the initial stop and detention of defendant was not an "arrest" and that the police could detain defendant temporarily to verify his identity before issuing a summons-complaint (maj. opinion at 21). However, defendant was not searched until after his identity had been verified, and he had nevertheless been placed under arrest. Therefore, the validity of the inventory search which revealed cocaine in defendant's possession turns on the validity of his arrest. Because I am unable to find any authority for a warrantless arrest under the circumstances of this case, I dissent.
The offense for which defendant was placed under arrest was violation of a municipal ordinance prohibiting littering. The majority relies upon two sources of authority to validate this arrest without a warrant: (1) N.J.S.A. 40A:14-152; and (2) R. 3:4-1(c). In my judgment, neither of these provisions authorizes an arrest without a warrant for violation of a municipal ordinance prohibiting littering, even if the police are purportedly concerned that the violator will not respond to a summons.

I
The majority properly recognizes that the starting point in interpreting N.J.S.A. 40A:14-152 is the common law of arrest. At common law the power of arrest without a warrant did not extend to every offense. A police officer could make an arrest without a warrant for a misdemeanor only when the offense involved a breach of the peace and was committed in his *24 presence. 1 Wharton's Criminal Procedure (12th ed. 1974), § 63 at 168. And absent statutory authorization, an officer could not make an arrest without a warrant for breach of a municipal ordinance, even if committed in his presence. Id. at § 68. This common law rule is reflected in Mayor & Common Council of Newark v. Murphy, 40 N.J.Law 145 (Sup.Ct. 1878) and Pell v. Newark, 49 N.J.Law 594 (Sup.Ct. 1887), and is expressly stated in State v. Scharfstein, 73 N.J. Super. 486, 489 (Cty.Ct. 1962), rev'd on other grounds, 79 N.J. Super. 236 (App. Div. 1963), aff'd, 42 N.J. 354 (1964). See also Delafoile v. State, 54 N.J.Law 381, 385 (E. & A. 1892). Therefore, if the power of arrest in this State were governed solely by the common law, no arrest without a warrant could be made for the violation of any municipal ordinance. However, the majority correctly concludes that N.J.S.A. 40A:14-152 and certain other legislative enactments authorize arrests without a warrant under circumstances beyond those permitted at common law.
N.J.S.A. 40A:14-152 provides in pertinent part:
The members and officers of a police department and force, within the territorial limits of the municipality, shall have all the powers of peace officers and upon view may apprehend and arrest any disorderly person or any person committing a breach of the peace.
There are two preconditions to exercise of the power of arrest under this section: (1) the offense must have occurred "upon view" of the officer, and (2) the offender must be either a "disorderly person" or have committed a "breach of the peace." Consequently, with respect to disorderly persons offenses, see N.J.S.A. 2C:1-4b, the common law requirement of a "breach of the peace" is not a precondition to an arrest without a warrant under N.J.S.A. 40A:14-152. However, with respect to other offenses, the requirement of a "breach of the peace" remains in effect. Therefore, while I agree with the majority that N.J.S.A. 40A:14-152 may be reasonably interpreted to change the common law and to authorize an arrest without a warrant for a violation of certain municipal ordinances, this authorization is *25 limited to violations of municipal ordinances involving a "breach of the peace."
Defendant's alleged offense did not involve any "breach of the peace." He simply dropped a napkin onto the street. There was no physical altercation between defendant and the arresting officer nor any threatening or abusive words. The majority suggests that defendant's littering offense was transformed into a breach of the peace because he dropped the napkin a second time after being asked by the officer to pick it up. However, the record does not indicate that defendant acted in deliberate defiance of the officer and the trial judge made no such finding. In any event, a simple act of insolence towards authority does not constitute a "breach of the peace." Cf. State v. Profaci, 56 N.J. 346 (1970) (traffic violator who exited vehicle and said in a loud voice to officer issuing summons, "what the f____ are you bothering me for," did not invite "breach of the peace.") A leading commentary on criminal law summarizes the case law construing the term "breach of the peace" as follows:
Illustrative of acts amounting to a breach of the peace are: public brawling; challenging or provoking another to fight; engaging in an affray; discharging a firearm on a public street; unlawfully possessing or selling intoxicating liquor; being intoxicated and yelling on a public street; entering the dwelling house of another with weapons in such manner as to cause terror and alarm to the occupants. [4 Wharton's Criminal Law (14 ed. 1981), § 522 at 176-177].[1]
Defendant's actions in throwing litter on the street had a much lesser impact on public order than any of these illustrations and in my judgment cannot reasonably be found to have constituted a "breach of the peace." Therefore, defendant's arrest without a warrant was not authorized by N.J.S.A. 40A:14-152.

*26 II
The second source relied upon by the majority to justify defendant's arrest without a warrant is R. 3:4-1. However, this court rule does not confer any power of arrest without a warrant. Rather, the subject matter of R. 3:4-1 is the procedures to be followed after an arrest has been made. Thus, the title of the rule is, "Procedure After Arrest." On the date defendant was arrested the primary subsection dealing with release of offenders upon issuance of a summons was R. 3:4-1(b),[2] which provided:
Subject to paragraph (c), whenever a law enforcement officer has effected a lawful arrest without a warrant for any offense except [enumerated serious crimes], the arrested person shall be taken to a police station where the officer in charge shall, after completion of all post arrest identification procedures required by law, issue a summons to him and release him in lieu of continued detention unless he determines that any of the conditions set forth in paragraph (c) hereof exists. [Emphasis added].
R. 3:4-1(c) qualified R. 3:4-1(b) by setting forth specific circumstances under which a person arrested for a minor offense was not required to be released upon issuance of a summons. The parts of this subsection relied upon by the majority stated:
The officer in charge of the station house shall have the discretion not to issue a summons to an arrested person when any of the following conditions exists:
(1) The person has previously failed to respond to a summons;
* * * * * * * *
(6) The officer has reason to believe the person will not appear in response to a summons. [Emphasis added].
Thus, R. 3:4-1 presupposes that a person has been lawfully arrested and sets forth procedures for the subsequent processing of the arrestee. It does not confer a power of arrest without a warrant in circumstances where that power is otherwise lacking.
*27 The Supreme Court's Committee on Criminal Practice's reports leading up to adoption of the "summons in lieu of warrant" provisions of R. 3:4-1 confirm that there was no intent to expand the police's power of arrest. See 99 N.J.L.J. 395, 396 (1976); 100 N.J.L.J. 441, 442 (1977); 105 N.J.L.J. 425, 426 (1980). The first of these reports explicitly states that "... the proposed rule change ... does not affect the power of the police to make arrests." 99 N.J.L.J. at 426. Indeed, these reports make it clear that the intent of the rule change was to increase the use of summons in place of warrants. The Committee's first report on that subject stated:
[T]he Committee noted various apparent problems caused by the excessive use of warrants. Included are the resulting overcrowded cell blocks and detention facilities, discrimination against the poor who are without ready access to counsel and bail in many cases, and the reduced police resources available on the streets by virtue of the time and effort expended in present arrest and booking procedures.
Therefore, by interpreting a rule designed to reduce pretrial detentions as authorization for expanding the police's power of arrest, the majority has in effect turned R. 3:4-1 on its head.

III
I do not question the power of the Legislature to authorize an arrest under the circumstances presented by this case. Indeed, the Legislature has conferred the power of arrest with respect to certain minor offenses. See, e.g., N.J.S.A. 40A:14-158; N.J.S.A. 39:5-25. However, there are substantial competing policy considerations which must be weighed in determining whether to authorize arrests without a warrant for minor offenses. On the one hand, there is a public interest in securing the presence at trial of any alleged offender. On the other hand, it may be concluded that some offenses, such as illegal parking, jaywalking, and littering, do not pose a sufficiently grave threat to the public welfare to warrant even the temporary detention of an alleged offender pending the posting of bail. Furthermore, since there inevitably will be some persons who will be unable to post bail, there also are public interests in not incarcerating persons *28 accused of minor regulatory offenses solely on account of their indigency and in not exacerbating existing problems of prison overcrowding. The Legislature has balanced these competing policy considerations by limiting the power of arrest to violations of municipal ordinances involving a "breach of the peace." Since I am unable to find any "breach of the peace" in defendant's violation of Plainfield's antilittering ordinance, I conclude there was no authority to arrest defendant and that the inventory search conducted in connection with his arrest was unlawful. Accordingly, I would reverse the order denying the motion to suppress and remand the matter to permit defendant to retract his guilty plea.
NOTES
[1] R. 3:4-1 was amended effective January 1, 1987. We have employed the present rule designations. At the time of Hurtado's "arrest," similar provisions were contained in R. 3:4-1(b) and (c).
[1] I note that the two cases cited by Wharton for the conclusion that the possession and sale of alcoholic beverages may amount to a breach of the peace are prohibition era decisions in Tennessee. Hughes v. State, 145 Tenn. 544, 238 S.W. 588 (Sup.Ct. 1922); State v. Reichman, 135 Tenn. 653, 188 S.W. 225 (Sup.Ct. 1916). In the latter case the court said: "The sale of intoxicating liquors has always been recognized as tending to provoke disturbances of good order and breaches of the peace." 188 S.W. at 228.
[2] This subsection was substantially amended and redesignated subsection (c) effective January 1, 1987. The former subsection (c) was redesignated subsection (d) effective the same date. The 1987 amendments to R. 3:4-1 do not appear to bear on the issues presented by this appeal.