771 A.2d 651 (2001)
339 N.J. Super. 244
STATE in the Interest of J.M.
Superior Court of New Jersey, Appellate Division.
Submitted February 7, 2001.
Decided April 10, 2001.
*652 Peter A. Garcia, Acting Public Defender, for appellant, J.M., (Barbara A. Hedeen, Assistant Deputy Public Defender, of counsel and on the brief).
Arthur J. Marchand, Cumberland County Prosecutor, for respondent, State of New Jersey, (Susan Novick, Assistant Prosecutor, of counsel and on the brief).
Before Judges KEEFE, STEINBERG and WEISSBARD.
The opinion of the court was delivered by WEISSBARD, J.A.D.
J.M., a seventeen-year-old juvenile, appeals from his conviction, upon a plea of guilty, to a charge of juvenile delinquency based upon an offense which, if committed by an adult, would constitute possession of a controlled dangerous substance. He was sentenced to serve a term of two years at the New Jersey State Training School for Boys in Jamesburg, suspension of his driving privileges and appropriate fines and penalties.[1] On appeal, J.M. challenges the legality of the search which resulted in seizure of the controlled dangerous substance upon which his plea and sentencing were based. N.J.S.A. 2A:4A-40. We conclude that the search violated J.M.'s rights and that his motion to suppress the evidence should have been granted. Accordingly, we reverse the adjudication of delinquency.
At the suppression hearing the following facts were developed. On September 30, 1998 at about 8:00 p.m. Vineland police officers Romano and Farabella were on routine patrol on Grape Street, a residential area near the center of town. Approximately two weeks earlier, Jessie Cruz, a tenant at 637 Grape Street, had approached Romano as he drove past her home and related that she was having a problem with people "hanging out" on her porch and dealing drugs. She asked the officer to get in touch with her if he saw people on the porch and told him that she would be able to identify the people that belonged there and those that did not. According to Romano, the police had received complaints about trespassers and narcotics activity in that area in the past, and Romano had actually made arrests at that location.
As the officers proceeded down Grape Street, Romano shined a spotlight on the Cruz residence and saw three people on the porch. He drove his police car into the driveway of the premises with the intention of making inquiry of the persons he had seen, notwithstanding the absence of any particular complaints that evening. Both officers proceeded from their vehicle onto the porch.
While Romano rang the doorbell to summon Ms. Cruz, Officer Farabella spoke with the people on the porch, none of whom appeared to be engaged in illegal activity. Cruz, in response to police inquiry, identified two of the porch occupants as her relatives, but said that she did not know the third person, the juvenile J.M. She did not ask that J.M. be removed. When asked why he was sitting on the porch, J.M. told the police that he was "hanging out." He was asked if he would agree to be searched and readily complied. *653 Romano conducted a pat-down and checked J.M.'s pockets. Nothing was found. Romano pointed out to J.M. that there was a "no trespassing" sign in the window of the house. He then handcuffed J.M., took him into custody for the petty disorderly persons offense of defiant trespass, N.J.S.A. 2C:18-3b, and transported him to the police station. At the station defendant was immediately subjected to a full search by another officer and drugs were found inside his right sock and under the arch of his left foot.
Although the defense offered testimony to contradict critical aspects of the events testified to by the officers, we need not review that testimony since the trial court did not find it credible. Rather, the court accepted the officers' testimony, as we have set it out at length above. The trial court found that the police could reasonably have concluded that J.M. was on the premises without the authorization of the tenant and that there was, therefore, probable cause to conclude that he was trespassing. As a result, they had the authority to take him into custody and subsequently search him at the police headquarters incident to his anticipated detention. On appeal, J.M. argues that the police did not have probable cause to take him into custody, and that even if they did, there was no justification for the subsequent full search of his person at the police headquarters.
We find that there was no probable cause to believe J.M. was a trespasser at 637 Grape Street. N.J.S.A. 2C:18-3(b) provides, in pertinent part, as follows:
A person commits a petty disorderly persons offense if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by:
* * *
(2) posting in a manner prescribed by law or reasonably likely to come to the attention of intruders

* * *
In this case J.M. was present on the porch with two other individuals who apparently were relatives of the tenant. Although the tenant told the police that she did not know defendant, there was no testimony that she asked the police to remove J.M. or that the officers even asked her if that was her wish. More importantly, the officers never asked the two other people, who clearly did have permission to be on the porch, whether J.M. was known to them or was present by their invitation. Defendant's response that he was "hanging out" is not dispositive. The critical question was whether he was "hanging out" with permission, express or implied, of those who did have the right to be there. The mere fact that a no trespassing sign was displayed in the window did not make J.M. a trespasser. It is highly unlikely that J.M. just happened to be on this particular porch "hanging out" with two relatives of the tenant, without someone having invited him to be there. While conceivable, it belies common sense that he just wandered off the street to join two other young people who were not trespassers. We do not ask the police to conduct a mini-trial but simply to make a good faith evaluation of the circumstances presented, including appropriate inquiries of witnesses, before effectuating an arrest. In this case, we find that they failed to do so. Thus, J.M.'s arrest was impermissible and the resulting search invalid.
Even if we were to conclude that probable cause existed to arrest J.M., that would not end our inquiry nor change our ultimate conclusion that the evidence should have been suppressed. Once J.M. arrived at the station house he was *654 promptly subjected to a full search, presumably incident to his anticipated detention. It is fundamental that any search conducted without a warrant is presumptively invalid. State v. Hill, 115 N.J. 169, 173, 557 A.2d 322 (1989). The State bears the burden of establishing by a preponderance of the evidence that the search falls within one of the recognized exceptions to the warrant requirement. Id. at 174, 557 A.2d 322. In this instance the State relies upon the "search incident to arrest" exception. "Such a search is permitted to protect the safety of the officer and to preserve evidence that may be destroyed or removed." State v. Bradley, 291 N.J.Super. 501, 509, 677 A.2d 1129 (App.Div. 1996). Of course, in the case of a juvenile, being taken into custody is not "construed as an arrest," but is "deemed a measure to protect the health, morals and well being of the juvenile ." N.J.S.A. 2A:4A-31c; R. 5:21-1. Thus, we more appropriately refer to the exception in this context as a "search incident to detention." Here, J.M. was detained for the petty disorderly persons offense of criminal trespass. Since there is no evidence or instrumentality of criminal trespass and the officers' safety concerns, if any, were addressed by the on-the-scene frisk, the "search incident" exception does not justify the subsequent full-blown search at the police station. That search was remote in both time and place from the location of the arrest. Bradley, supra, 291 N.J.Super. at 510-12, 677 A.2d 1129. Rather, such a search is more properly addressed under the "inventory" exception to the warrant requirement, which comes into play when the arrestee is to be incarcerated. Illinois v. Lafayette, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65, (1983); State v. Paturzzio, 292 N.J.Super. 542, 550, 679 A.2d 199 (App.Div.1996). However, such a search can only be sustained if the juvenile was lawfully deemed subject to detention in the first instance.
If probable cause existed, J.M. could be taken into custody for delinquency, "pursuant to the laws of arrest and the Rules of Court." N.J.S.A. 2A:4A-31a(2). Pursuant to N.J.S.A. 2A:4A-33, upon taking J.M. into custody the police were required to "immediately notify the parents, or the juvenile's guardian, if any, that the juvenile has been taken into custody." Moreover, once in custody, the right of the police to further detain the juvenile was governed by N.J.S.A. 2A:4A-34. Initially, we set out the first two subsections of the statute in full:
a. Where it will not adversely affect the health, safety or welfare of a juvenile, the juvenile shall be released pending the disposition of a case, if any, to any person or agency provided for in this section upon assurance being received that such person or persons accept responsibility for the juvenile and will bring him before the court as ordered.
b. No juvenile shall be placed in detention without the permission of a judge or the court intake service.

[emphasis added]
In this case the record does not reveal that any efforts were made to contact J.M.'s parents or guardian, or to release him to "any person or agency," nor is there any indication that permission of a judge or the court intake service was obtained, or even sought, before detention. Indeed, the criteria for placing a juvenile into detention are stringent. Subsection c of 2A:4A-34 goes on to provide as follows:
c. A juvenile charged with delinquency may not be placed or retained in detention under this act prior to disposition, except as otherwise provided by law, unless:

*655 (1) Detention is necessary to secure the presence of the juvenile at the next hearing as evidenced by a demonstrable record of recent willful failure to appear at juvenile court proceedings or to remain where placed by the court or the court intake service; or
(2) The physical safety of persons or property of the community would be seriously threatened if the juvenile were not detained and the juvenile is charged with an offense which, if committed by an adult would constitute a crime; or
(3) When the criteria for detention are met and the juvenile is charged with an offense which, if committed by an adult, would constitute a disorderly persons or petty disorderly persons offense, the juvenile may be placed in detention temporarily. Police and court intake personnel shall make all reasonable efforts to locate a parent or guardian to accept custody of the juvenile prior to requesting or approving the juvenile's placement in detention. If, after the initial detention hearing, continued detention is necessary, the juvenile shall not be detained in a secure facility but shall be transferred to a shelter or other non-secure placement.
Subsection c(3) was added to the statute by L. 1989 c. 306, § 1. The Senate Judiciary Committee Statement accompanying the bill notes that it was specifically intended to alter prior law, which permitted detention of juveniles charged with repetitive disorderly persons offenses if there was a likelihood of custodial disposition upon adjudication. The bill, according to the Statement, "would only permit pre-adjudication detention of juveniles charged with crimes. Juveniles charged with [a] disorderly persons offense could, however, be initially detained when attempts to locate a parent or guardian have been unsuccessful." The statute goes on to provide a series of alternatives that the court or intake officer must consider before ordering detention, beginning with "release to parents," or "release on juvenile's promise to appear at next hearing," and continuing to "any other restrictions other than detention of shelter care reasonably related to securing the appearance of the juvenile." N.J.S.A. 2A:4A-34d.
N.J.S.A. 2A:4A-35 provides:
Release of juvenile on own recognizance
A juvenile charged with delinquency may be released at either the police or court level on his own recognizance if all of the following circumstances have been met:
a. The nature of the offense charged is not such that a danger to the community would exist if the juvenile were released;
b. There is no parent, guardian or other appropriate adult custodian to whom the juvenile could be released and all reasonable measures have been exhausted by either police or court personnel to locate and contact any such person;
c. The juvenile is at least 14 years of age.
d. The identity and address of the juvenile are verified through a positive form of identification; and
e. Reasonable certainty exists on the part of the releasing authority that upon release, the juvenile will return to school or home safely and will appear at his hearing.
Finally, N.J.S.A. 2A:4A-37c provides in part as follows:
A juvenile being held for a charge under this act ... including a juvenile who has reached the age of 18 years *656 after being charged, shall not be placed in any prison, jail or lockup nor detained in any police station, except that if no other facility is reasonably available a juvenile may be held in a police station in a place other than one designed for the detention of prisoners and apart from any adult charged with or convicted of crime for a brief period if such holding is necessary to allow release to his parent, guardian, other suitable person, or approved facility ...

[emphasis added]
The Rules of Court mirror and implement these statutory requirements. R. 5:21-2.
The record does not remotely suggest that these procedures were followed in the case of J.M. As we have noted, it appears there was no effort made to contact his parents or guardian, nor was there any involvement of the court or intake officer. As a result, the police had no authority to detain him and the search incident to his detention cannot be sustained.
The State relies upon three cases to support the search of J.M. In State in Interest of J.G., 227 N.J.Super. 324, 547 A.2d 336 (Ch.Div.1988), the juvenile was a runaway and the police had been directed by the Juvenile Family Crisis Intervention Unit to take him into custody and bring him before the Family court for a hearing. Thereafter, the police did find the youngster and conducted a "pat-down" search prior to putting him in the police car. A bag of marijuana was found in his pocket. The search was upheld as "incident to the custodial detention of the juvenile." Id. at 327, 547 A.2d 336. In that case, unlike the present one, the police had specifically been directed by an officer of the court to place the juvenile into custodial detention for the purpose of transporting him to court.
State in Interest of J.B., Jr., 131 N.J.Super. 6, 328 A.2d 46 (J. & D.R. Ct.1974), involved a juvenile who the police had probable cause to believe had left the scene of a motor vehicle accident after sustaining injuries. He was found wandering not far from the accident scene and lied to the police about his presence in the area. The juvenile was searched at the scene and marijuana was discovered in his pocket. At the hospital he was subjected to a "more extreme search" which revealed more marijuana in one of his socks. Having found probable cause to believe that the youth was a juvenile delinquent, the court upheld the search without further discussion. There is no indication that the search itself or its scope was challenged; the issue addressed at length by the court being that of probable cause. Moreover, J.B., Jr. was decided before the statutes and court rules discussed above took effect. If the decision can be read to sustain a full search incident to arrest for juvenile delinquency based upon a motor vehicle violation, we overrule it.[2]
Similarly, in State in Interest of A.R., 216 N.J.Super. 280, 523 A.2d 678 (App.Div. 1987), the court found sufficient grounds for the detention of the juvenile for investigation of narcotics possession. Pursuant to a pat-down which the court found justified, a square object was removed from A.R.'s pocket. The object turned out to be a soft black leather pouch which the officer recognized as a common container for controlled dangerous substances. The issue addressed by the court was whether a warrant was required before the container *657 could be opened. Finding that the opening of the pouch at the scene constituted only a "minimal intrusion" on the juvenile's privacy the search was justified given the probable cause finding. Id. at 286-87, 523 A.2d 678. In the present case the search which uncovered the drugs was not the result of a valid pat-down at the scene and was considerably more than minimally intrusive.
It is important to note that although we decide this case based upon the statutes and rules authorizing the custodial detention of juveniles only in certain limited circumstances, "we do so against the background of applicable constitutional principles." State v. Hayes, 327 N.J.Super. 373, 379, 743 A.2d 378 (App.Div.2000).
We recently had occasion to discuss these same issues in State v. Dangerfield, 339 N.J.Super. 229, 771 A.2d 642 (App.Div. 2001), a case involving an adult arrested for defiant trespass and subjected to a full search incident to that arrest. As we said there, the authority of police to search incident to arrest for minor offenses is not absolute. In State v. Pierce, supra, the Court held that vehicular searches were not automatically authorized following arrests for motor vehicle offenses, thereby rejecting the bright-line rule of New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In reaching its conclusion, the Court took note of cases, standards and commentators that had questioned the propriety of detention or arrest "in respect of offenses that pose little threat to police safety." Pierce, supra, 136 N.J. at 193, 642 A.2d 947. The Court, id. at 194, 642 A.2d 947, quoted Professor LaFave's hope that the United States Supreme Court would one day conclude,
that there are some constitutional limits upon the use of `custodial arrests' as the means for invoking the criminal process when relatively minor offenses are involved. Such a holding would be most desirable, as it would address specifically a current problem of considerable seriousness: the arbitrariness and inequality which attends unprincipled utilitization of the `custodial arrest' and citation alternatives. Moreover, it would substantially diminish the opportunities for pretext arrests ...
[2 Wayne R. La Fave, Search and Seizure, § 5.2(g), at 465 (2d ed.1987) (citations omitted) ]
Even earlier the Court had found impermissible the search of an individual arrested for violation of a municipal anti-littering ordinance. State v. Hurtado, 219 N.J.Super. 12, 529 A.2d 1000 (App.Div.1987), rev'd on dissent, 113 N.J. 1, 549 A.2d 428 (1988). There, Hurtado was taken to the station house for identification, after which bail was set at $100 due to prior incidents of his having failed to answer other municipal summonses. Because he "did not have the bail, he was placed in a holding cell, and an inventory search was conducted incident thereto." Hurtado, supra, 219 N.J.Super. at 17, 529 A.2d 1000. Drugs were discovered during that search. Finding Hurtado's arrest lawful, the Appellate Division majority upheld the search, while noting that "a person arrested for a minor offense must first be informed of his right to post collateral, and given an opportunity to do so prior to conducting an inventory search." Id. at 22, 529 A.2d 1000 [citations omitted]. Judge Skillman, dissenting, was of the view that the law did not authorize an arrest for the littering offense, thereby rendering defendant's detention and the subsequent search improper. Id. at 23-28, 529 A.2d 1000. The Supreme Court agreed with Judge Skillman and held that the evidence must be suppressed.
State v. Vonderfecht, 284 N.J.Super. 555, 665 A.2d 1145 (App.Div.1995), held that an *658 arrest may be made for the petty disorderly persons offense of defiant trespass, the same offense for which J.M. was taken into custody. After a careful analysis of the legislative history the court found no reason to distinguish between disorderly persons offenses and petty disorderly offenses insofar as the authority to arrest conferred on a police officer by N.J.S.A. 40A:14-152 is concerned. Having concluded that the defendant was subject to arrest the court, without discussion, upheld a full station house inventory search. We are unable to tell whether the search was challenged on the grounds discussed herein. However, if the case can be read authorizing a full inventory search, incident to incarceration, for this minor offense, without reference to the obligation to pursue release options for the juvenile prior to such detention, then we respectfully disagree.
Other states have also noted "that a modern policy has emerged favoring the issuance of citations and summonses over custodial arrests for minor offenses." People v. Bland, 884 P.2d 312, 316 (Colo.1994). Where a custodial arrest is not justified, the police may only "(1) conduct a pat-down search for weapons in circumstances where such a search would be authorized under the Terry line of cases; and (2) search for instrumentalities or evidence of the specific crime for which the officer had probable cause to make the arrest." Id. at 321. Similarly, in Alaska an inventory search of a person arrested for a minor offense with respect to which bail has been or will be set is precluded until the individual has been given a reasonable opportunity to post bail. Zehrung v. State, 569 P.2d 189 (Alaska 1977), modified in part on rehearing, 573 P.2d 858 (1978); Gray v. State, 798 P.2d 346 (Alaska App. 1990). As the court reasoned in Zehrung, "a warrantless jailhouse inventory is without justification when an arrestee is not going to be incarcerated, and it is therefore constitutionally impermissible." 569 P.2d at 193.
J.M.'s case is similar to that presented in State v. Carner, 28 Wash.App. 439, 624 P.2d 204 (1981), which also involved the station house search of a juvenile. Carner was speeding on a motorcycle, and then tried to evade police by racing down city streets; he also had no driver's license. The police effectuated a custodial arrest and searched defendant at the scene. He was then taken to the police station, given citations for having no license and switching license plates. Additional charges for evading and speeding were expected to be filed later. Nevertheless, defendant's mother was called to pick him up, but while awaiting her arrival another police officer asked defendant to empty his pockets, as a result of which cocaine was found. Although concluding that this scenario presented more than a mere traffic violation, and that a custodial arrest was therefore warranted, the court upheld the trial court order of suppression. Once having determined that defendant would be released to his mother, and having already been frisked, there was no justification for a further search:
There was no danger of weapons, or that he might possess evidence relevant to the crime for which he was arrested. The further danger that the defendant might possess items which would aid in his escape or carry contraband or drugs to his jailmates could exist only if the police intended to detain him. Once the administrative decision was made to release him without further detention, these dangers ceased to exist and gave the police no reasonable basis for a detailed body search.

[624 P.2d at 208]
For the reasons we have set out above, there was no probable cause to arrest J.M. and, even if probable cause existed, J.M.'s *659 detention and ensuing body search were not justified since the required procedures for such a detention were not followed. As a result, the motion to suppress should have been granted.
Reversed.
NOTES
[1] We are advised that J.M. was paroled on October 30, 2000.
[2] The court's conclusion that the juvenile could be arrested for what was essentially a motor vehicle offense runs counter to the present rule as established by State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994).