771 A.2d 642 (2001)
339 N.J. Super. 229
STATE of New Jersey, Plaintiff-Appellant,
v.
William DANGERFIELD, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted February 15, 2001.
Decided April 10, 2001.
*643 John Kaye, Monmouth County Prosecutor, attorney for the appellant (Maria DeMuth, Assistant Prosecutor, of counsel and on the brief).
Peter A. Garcia, Acting Public Defender attorney for respondent (Sylvia Orenstein, Assistant Deputy Public Defender, of counsel and on the brief).
Before Judges KEEFE, STEINBERG and WEISSBARD.
The opinion of the court was delivered by WEISSBARD, J.A.D.
Pursuant to leave granted, the State appeals the trial court's order suppressing cocaine seized from defendant's pocket after his arrest for the petty disorderly persons offense of defiant trespass, N.J.S.A. 2C:18-3b. We affirm.
On November 2, 1999, at 6:40 p.m. a rainy evening, Detectives Chapparo and *644 Mooney of the Long Branch police department were driving on Liberty Street in the area of the Grant Court and Garfield Court Federal Housing complexes.[1] They were in plainclothes, in an unmarked vehicle, and were targeting the two areas for trespassing and narcotics violations. Upon leaving their car and entering the Grant Court complex the officers saw an individual, later identified as defendant, sitting on the bar of a bicycle, close to an area in the complex known for narcotics activity. As Chapparo approached the man, he recognized him as defendant, who was known to him. Upon seeing the officer, defendant rode off on his bicycle, heading out of the complex. Chapparo gave chase and, after fifteen to twenty feet, "grabbed [defendant] on the bike."
Upon seizing defendant, Chapparo asked why he departed and what his reason was for being in Grant Court, to which defendant apparently gave "no reason, no answer." Defendant said that he was "doing nothing." Without further inquiry, defendant was placed under arrest for trespassing. A search at the scene revealed two bags of cocaine in defendant's front left pocket.
Chapparo's prior contacts with defendant at the complexes occurred on two occasions. The first was "a few years back" when he stopped defendant in Garfield Court. Defendant said he was an employee and, upon producing an identification card, was released. However, Chapparo later spoke with the Director of the complex who said that defendant had been but was no longer an employee. The second encounter came when defendant had been visiting a friend in Grant Court. Chapparo stopped defendant and told him what he had previously learned about his employment status. Defendant insisted that he did work for Randy Phillips, the Director or Assistant Director of the complex, and again showed an identification card. He was again released. Subsequently, Phillips told Chapparo that defendant did not work for the complex. Finally, Chapparo had apparently arrested defendant on unspecified charges several months before the night in question, at which time he was employed by Monmouth University.
The general procedure followed by the officers was to inquire of persons such as defendant as to their reason for being in the complexes. If the individual indicated that they were visiting a resident, the officers would attempt to confirm the information by taking the visitor back to the apartment in question or having headquarters call that resident to confirm their familiarity with the individual stopped. For that purpose, the officers had a list of all tenants in complexes, provided to them by management, with phone numbers in many cases. If the suspect provided the name of someone on the list, they were usually released. If the name was not provided they would go with the suspect to the apartment. If the resident did not know the individual, or the suspect had otherwise lied, they would be arrested for trespassing. At the end of each building were signs warning against trespassing.
Defendant testified that on November 2, 1999, he had gone to Grant Court, as usual, to visit his son Billy, who lived there with his mother at 23 Grant Court. His son's grandmother also lived in the complex, in the building directly across from where defendant was seated on his bicycle. That day defendant found Billy outside, *645 playing in the walkway between his mother's and his grandmother's houses. Defendant had been in the complex ten to fifteen minutes when the police arrived. By that time, Billy had gone inside and it had begun to rain. Defendant testified that there were two other people present, a girl to whom he had been talking, and a man, whom the police approached. When he saw the officers talking to the man, defendant started to leave because, in his words, "Chapparo always liked to hassle me sometimes. Sometimes he kids. Sometimes he doesn't. But, you know, I just doesn't [sic] want have anything to do with it." As he was riding away, Chapparo ran up and grabbed him by the shoulder and told him to come back. Defendant insisted that the officer never asked him why he was there or informed him that he was under arrest. Rather, without saying anything, the officer reached into his pockets. Defendant testified that Chapparo often saw him in the area, and that he would have told the officer he was visiting his son and his son's grandmother, had he been asked. Defendant acknowledged that he had once shown Chapparo an identification card when the officer asked him what he was doing in Garfield Court. Defendant stated that at the time he was working for the Housing Authority. He explained that he had worked for the Authority, been fired, and then had returned to employment.
Two other witnesses testified on defendant's behalf. The first, Tracy Fann, the mother of defendant's son, confirmed that at the time of the incident she and her child lived at 23 Grant Court and that defendant visited his son almost every day until Thanksgiving of 1999. Fann had previously told the police that defendant was the father of her son. She testified that defendant was welcome in her apartment, and that the police never told her or defendant that he was not welcome to come there.
Randolph Phillips, the Director of Management and Housing Director for the Long Branch Housing Authority, testified that he had known defendant for six or seven years. Phillips was aware that Tracy Fann lived at 23 Grant Court in November, 1999. He said that he had no reason to think that defendant was not welcome there, and testified that although he had spoken to the police about keeping certain individuals out of the complex, defendant was not among those persons. He also confirmed that defendant had been doing work for him personally at the time of the incident.
Without making any specific findings, the trial court found Chapparo to be more credible. However, the court also believed some or all of Ms. Fann and Mr. Phillips' testimony, finding that defendant was not in fact a trespasser since he was visiting his child who lived there, and indeed, "was there all the time. He was welcome." Thus, the court at first suggested that the motion turned not on credibility but on the law. Since, the court concluded, defendant fit squarely within the statutory defense to the trespass statute, in that he "reasonably believed that the owner of the structure, or other person empowered to license access thereto, would have licensed him to enter or remain ..." N.J.S.A. 2C:18-3d(3), it found that defendant was not a trespasser and there was, therefore, no basis for his arrest and search.
To the extent that the court found Chapparo to be credible we are bound to accept that finding where the testimony of defendant and Chapparo conflicts, since it is supported by the record. State v. Locurto, 157 N.J. 463, 474, 724 A.2d 234 (1999); State v. Johnson, 42 N.J. 146, 161, 199 A.2d 809 (1964). The court, however, was mistaken in resolving the motion initially *646 on the basis that defendant was not in fact a trespasser. The critical inquiry was not guilt or innocence but probable cause.[2] Subsequently, in denying the State's motion for reconsideration, the trial judge clarified his ruling:
I found Chapparo to be credible, but that doesn't automatically follow that his arrest was based on probable cause.
On two prior occasions Chapparo and Dangerfield met on the premises. My recollection of the testimony is, at one time Dangerfield was an employee at the premises. Those two prior occasions there was no allegation of a trespass. And even if you take Chapparo's version as the correct and credible one, you don't automatically become a trespasser because you didn't answer. I think the arrest was on a mere hunch. The circumstances that I heard do not substantiate a finding of probable cause. This was not a well grounded suspicion despite credibility findings.
We must determine, therefore whether Chapparo, when he arrested defendant had a well grounded belief that defendant was committing or had committed the offense of criminal trespass. State v. Macri, 39 N.J. 250, 260-61, 188 A.2d 389 (1963); State v. Sims, 75 N.J. 337, 355, 382 A.2d 638 (1978). As with many such street encounters, the incident must be reviewed in steps.
At the outset, the officer had the right to approach defendant in order to make an inquiry, without any grounds or suspicion. State v. Rodriguez, 336 N.J.Super. 550, 559, 765 A.2d 770 (App.Div.2001); State v. Maryland, 327 N.J.Super. 436, 449, 743 A.2d 876 (App.Div.2000). Here, defendant was sitting alone on his bicycle in a large housing complex but was not engaged in any suspicious activity, although the general vicinity was apparently known for narcotics activity. In simply deciding to speak with defendant and approaching him for that purpose Chapparo did not violate any constitutional right of defendant.
However, as also frequently occurs, encounters such as this may escalate from one level of intrusion to another. In this instance, defendant, upon seeing, Chapparo, took off on his bike. Chapparo gave chase and forcibly stopped him. In order to justify that seizure, Chapparo was required to have an articulable, reasonable basis for suspicion. Rodriguez, supra; Maryland, supra. That level of suspicion is something less than probable cause, and is to be judged on an objective basis. Maryland, supra. Against defendant's departure upon seeing Chapparo we must balance the fact that Chapparo knew defendant from previous encounters at both Grant Court and Garfield Court. There was no testimony that defendant had previously engaged in specified illegal activity, including an absence of any connection between the arrest of defendant on unspecified charges several months earlier and his presence in Grant Court on November 2, 1999. In addition, the last time Chapparo had encountered defendant at Grant Court, defendant was visiting a friend. Under those circumstances, we agree with the trial judge that this was not a case where defendant's attempt to leave the area rather than speak with Chapparo *647 created a reasonable suspicion sufficient to justify the stop. Compare State v. Tucker, 136 N.J. 158, 642 A.2d 401 (1994)(flight alone does not create reasonable suspicion for stop), with State In Interest of J.B., 284 N.J.Super. 513, 665 A.2d 1124 (App. Div.1995) (flight in conjunction with other circumstances can create reasonable suspicion for stop); State v. Doss, 254 N.J.Super. 122, 603 A.2d 102 (App.Div.), certif. denied, 130 N.J. 17, 611 A.2d 655 (1992) (same); State v. Ruiz, 286 N.J.Super. 155, 668 A.2d 460 (App.Div.1995) certif. denied, 143 N.J. 519, 673 A.2d 277 (1996) (same). As Judge Kestin noted in Ruiz, supra, 286 N.J.Super. at 163, 668 A.2d 460, "A departure alone signifies nothing more than behavior in fulfillment of a wish to be somewhere else." While a desire not to be in the presence of police may not be "commendable" it is also "not an unlawful attitude." State v. Kuhn, 213 N.J.Super. 275, 282, 517 A.2d 162 (App.Div.1986).
Indeed, this case bears remarkable similarities to Kuhn. There, officers saw defendant in a tavern parking lot in an area of high illegal drug activity. As the officers' vehicle pulled into the lot, defendant entered his car and drove off. The police gave chase and stopped him within a short distance. A frisk and discovery of contraband followed. This court found an insufficient basis for the stop of defendant's car and ordered the evidence suppressed. The court rejected the notion that mere presence in an area known for its drug activity would justify the stop, id. at 281, 517 A.2d 162, citing Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362-63 (1979). Similarly, there was nothing in the circumstances here to justify defendant's seizure by Chapparo.
Even if the stop could be countenanced, the next level of inquiry would be whether the ensuing event created probable cause for defendant's arrest. We agree with the trial court that it did not. According to Chapparo, when asked what he was doing in Grant Court, defendant replied that he was "doing nothing." Without more, defendant was arrested for trespassing. The officers never asked defendant whether he knew or was visiting anyone in the complex, as was their usual practice, nor did they call his attention to the "no trespassing" sign which was somewhere on the building.[3] In a large public housing complex such as Grant Court, we cannot say that defendant's presence, even if he responded as the officer claimed, created probable cause for his arrest. Since we have found that there was no reasonable suspicion for his stop and no probable cause for his arrest, there was no justification for the ensuing search.
Beyond this, there is yet an additional reason for affirming the suppression order under review. An arrest for the petty disorderly persons offense of defiant trespass does not carry with it an automatic, concomitant right to search defendant's person, as was done here.
We have recently called attention to the emerging modern policy "favoring the issuance of citations and summonses over custodial arrests for minor offenses." People v. Bland, 884 P.2d 312, 316 (Colo.1994), quoted in State in Interest of J.M., 339 N.J.Super. 244, 771 A.2d 651, 658 (App. Div.2001);[4]see American Bar Association, *648 Standards for Criminal Justice §§ 10-2.1, 2.2, 2.3 (2nd ed.1988) (hereinafter ABA Standards). In State v. Pierce, 136 N.J. 184, 642 A.2d 947 (1994), our Supreme Court held that vehicular searches were not automatically authorized following arrests for motor vehicle offenses, thereby rejecting the bright-line rule of New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In reaching its conclusion, the Court took note of cases, standards and commentators that had questioned the propriety of detention or arrest "in respect of offenses that pose little threat to police safety." Pierce, supra, 136 N.J. at 193, 642 A.2d 947. The Court, id. at 194, 642 A.2d 947, quoted Professor LaFave's hope that the United States Supreme Court would one day conclude,
that there are some constitutional limits upon the use of `custodial arrests' as the means for invoking the criminal process when relatively minor offenses are involved. Such a holding would be most desirable, as it would address specifically a current problem of considerable seriousness: the arbitrariness and inequality which attends unprincipled utilization of the `custodial arrest' and citation alternatives. Moreover, it would substantially diminish the opportunities for pretext arrests ...
[2 Wayne R. La Fave, Search and Seizure, § 5.2(g), at 465 (2d ed.1987) (citations omitted) ]
Even earlier the Court had found impermissible the search of an individual arrested for violation of a municipal anti-littering ordinance. State v. Hurtado, 219 N.J.Super. 12, 529 A.2d 1000 (App.Div.1987), rev'd on dissent, 113 N.J. 1, 549 A.2d 428 (1988). There, Hurtado was taken to the station house for identification, after which bail was set at $100 due to prior incidents of his having failed to answer other municipal summonses. Because he "did not have the bail, he was placed in a holding cell, and an inventory search was conducted incident thereto." Hurtado, supra, 219 N.J.Super. at 17, 529 A.2d 1000. Drugs were discovered during that search. Finding Hurtado's arrest lawful, the Appellate Division majority upheld the search, although noting that "a person arrested for a minor offense must first be informed of his right to post collateral, and given an opportunity to do so prior to conducting an inventory search." Id. at 22, 529 A.2d 1000[citations omitted). Judge Skillman, dissenting, was of the view that the law did not authorize an arrest for the littering offense, thereby rendering defendant's detention and the subsequent search improper. Id. at 23-28, 529 A.2d 1000. The Supreme Court agreed with Judge Skillman and held that the evidence must be suppressed.
This case involves the next higher level in our justice system, albeit the lowest level designated as an offense under our Penal Code.[5] Nevertheless, in our view, the same principles apply. As the Court noted in Pierce, supra, 136 N.J. at 192, 642 A.2d 947, the Uniform Rules of Criminal Procedure, approved by the National Conference of Commissioners on Uniform State Laws, "adopts the same restrictive standards for non-felony arrests as are set forth in the ABA Standards. Unif. *649 R.Crim. P. 211(b)(1)." As one court expressed it, "the question [is] when is a custodial arrest proper so as to call for a full incidental search." State v. Martin, 253 N.W.2d 404, 405 (Minn.1977)(where offense is punishable only by fine, custodial arrest and search incident thereto not permissible).
Upon his arrest for this minor offense, defendant was presumptively entitled to be released upon issuance of a summons, rather than being arrested. In State v. Pierce, supra, 136 N.J. at 191-92, 642 A.2d 947, as well as in both the majority and dissenting Appellate Division opinions in Hurtado, supra, the impact of the Court Rules on the right to effect a custodial arrest was discussed. Rule 3:3-1 provides that a summons rather than an arrest warrant "shall be issued" except in six designated situations, the first dealing with certain specified serious crimes, none of which would have been applicable here. Among the other reasons for allowing the issuance of a warrant rather than a summons are, "reason to believe that the defendant is dangerous to self, other persons, or property," R. 3:3-1(c)(3), situations where "the defendant's identity or address is not known and a warrant is necessary to subject the defendant to the jurisdiction of the court," R. 3:3-1(c)(5), and where "there is reason to believe that the defendant will not appear in response to a summons." R. 3:3-1(c)(6). It is mandatory that a summons issue if none of the listed exceptions are applicable. State v. Krivoshik, 289 N.J.Super. 132, 672 A.2d 1315 (Ch.Div.1995).
If a defendant is arrested when only a summons should have been issued, the appropriate remedy is "suppression of any evidence that may have been seized in connection with that arrest." State v. Egles, 308 N.J.Super. 124, 131, 705 A.2d 780 (App.Div.1998). In the present case, defendant should have been subject to only the issuance of a summons since there are no facts suggesting that he came within any of the exceptions to the Rule. Further, Rule 3:4-1(a)(2) provides that if a summons is issued, "the law enforcement officer may serve the summons and release the defendant," in contrast to those instances in which a warrant is issued, requiring presentation to a judge for setting of bail within twelve hours after the arrest. R. 3:4-1(b). As a result, defendant should have been entitled to immediate release upon issuance of a summons for this petty disorderly persons offense, and the consequent search incident to his arrest is invalid. State v. Hurtado, supra.
Even if bail was to be required, rather than release on personal recognizance, a full body search should be precluded until the individual has been given a reasonable opportunity to post bail. State v. Hurtado, supra, 219 N.J.Super. at 22, 529 A.2d 1000; Zehrung v. State, 569 P.2d 189 (Alaska 1977), modified in part on rehearing, 573 P.2d 858 (1978); Gray v. State, 798 P.2d 346 (Alaska App.1990).
In State v. Vonderfecht, 284 N.J.Super. 555, 665 A.2d 1145 (App.Div.1995), a panel of this court held that an arrest may be made for defiant trespass, the same offense at issue here. After a careful analysis of the legislative history the court found no reason to distinguish between disorderly persons offenses and petty disorderly offenses insofar as police authority to arrest is concerned. N.J.S.A. 40A:14-152. Having concluded that the defendant was subject to arrest, the court, without discussion, upheld a full station house inventory search. The opinion does not suggest the search was challenged on the grounds discussed herein. The court did not distinguish between a custodial arrest and a non-custodial arrest, and did not discuss the impact of the court rules, as we *650 have done. However, if that case can be read as authorizing a full inventory search, incident to incarceration, for this minor offense, without reference to the obligation to pursue release options prior to such detention, we respectfully disagree. The court cited two cases in support of its decision that a full station house search incident to arrest for trespass is permissible. In State v. Patino, 83 N.J. 1, 414 A.2d 1327 (1980), the Court held that an arrest for possession of a small amount of marijuana inside a motor vehicle, a disorderly persons offense, justified a search of the passenger compartment of the vehicle but did not warrant a search of the trunk. Of course, as we have noted above, police may generally conduct a search incident to arrest for evidence or instrumentalities of the crime. In the case of trespass, unlike marijuana possession, there is no evidence or instrumentality of the offense. The Vonderfecht court also cited State v. De Lorenzo, 166 N.J.Super. 483, 400 A.2d 99 (App.Div.1979), in which this court ordered suppression of evidence seized from a duffel bag defendant was carrying when he was taken to police headquarters as a result of driving with an expired registration. Since defendant was not under arrest, there could be no search incident, and there was no other legal justification for the search. Thus, neither case supports the proposition that there can be a full blown search incident to arrest for a petty offense such as defiant trespass.
We do not mean to suggest that the police are entirely powerless to search an individual arrested for a petty disorderly persons offense. Even where a custodial arrest is not justified the police may "(1) conduct a pat-down search for weapons in circumstances where such a search would be authorized under the Terry line of cases; and (2) search for instrumentalities or evidence of the specific crime for which the officer had probable cause to arrest." People v. Bland, supra, 884 P.2d at 321. In this case there is nothing in the record to support a frisk of defendant for weapons, State v. Thomas, 110 N.J. 673, 680-81, 542 A.2d 912 (1988); State v. Valentine, 134 N.J. 536, 636 A.2d 505 (1994), and, of course, as previously noted, there is no instrumentality or evidence of the crime in question, defiant trespass.
These are not trivial concerns. "[A]rrest involves a needless and wasteful invasion of personal freedom for many defendants." ABA Standards supra, commentary to § 10-2.2. Our court rules governing release of petty offenders, which have the force of law, Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406 (1950) cert. denied, 340 U.S. 877, 71 S.Ct. 123, 95 L.Ed. 638 (1950), are expressly designed to implement the policy favoring issuance of a summons to petty offenders and their immediate release in appropriate circumstances. As such their enforcement in this context is not only encouraged but mandated.
For the reasons we have set forth, the search of defendant was made in violation of his state and federal constitutional rights and the evidence seized in that search must be suppressed.
Affirmed.
NOTES
[1] Grant Court was described as having eight to ten buildings with about ten apartments in each building. Garfield Court was somewhat larger, with about twenty buildings with about ten to fifteen apartments in each.
[2] Even, had defendant later been tried and acquitted on the trespass charge, that would have no bearing upon the legality of the officers' actions. See State v. Murphy, 238 N.J.Super. 546, 553-54, 570 A.2d 451 (App. Div.1990); State v. Nugent, 125 N.J.Super. 528, 534, 312 A.2d 158 (App.Div.1973). There is, therefore, no need for us to address the State's argument that the statutory defense does not apply to defendant since he was found in a common area of the complex rather than inside a building.
[3] The record does not establish exactly where the signs were in relation to defendant, how large they were or how they were otherwise displayed so as to be "reasonably likely to come to the attention of intruders." N.J.S.A. 2C:18-3b(2).
[4] J.M. involved a juvenile arrested for defiant trespass who was frisked at the scene and then subjected to a full body search at the police station incident to his anticipated detention. We held the search impermissible.
[5] N.J.S.A. 2C:1-4 provides that, "Disorderly persons offenses and petty disorderly persons offenses are petty offenses and are not crimes within the meaning of the Constitution of this State ... Conviction of such offenses shall not give rise to any disability or legal disadvantage based on conviction of a crime." A sentence of six months in jail is the maximum that may be imposed for a petty disorderly offense. N.J.S.A. 2C:43-8.