887 A.2d 190 (2005)
381 N.J. Super. 572
STATE of New Jersey, Plaintiff-Respondent,
v.
Marcellus R. WILLIAMS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 31, 2005.
Decided December 13, 2005.
*192 Before Judges A.A. RODRÍGUEZ, ALLEY and C.S. FISHER.
Yvonne Smith Segars, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).
Peter C. Harvey, Attorney General, attorney for respondent (Hillary Horton, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we hold that the police lacked a reasonable and articulable suspicion when they attempted to frisk defendant upon an anonymous tip that "a black male wearing a black jacket" was selling drugs in a high crime area. The search following defendant's flight also cannot be legitimized as incidental to defendant's arrest for obstruction because a citizen's non-violent flight from an unreasonable *193 search and seizure cannot be validly criminalized.

I
Defendant was charged in Indictment No. 02-05-0710 with third-degree unlawful possession of a weapon, in violation of N.J.S.A. 2C:39-5(b), and fourth-degree obstruction, in violation of N.J.S.A. 2C:29-1(a). Indictment No. 02-05-0711 charged defendant with the second-degree offense of being a person prohibited from possessing a weapon, in violation of N.J.S.A. 2C:39-7(b).
After a brief evidentiary hearing, defendant's motion to suppress evidence was denied for reasons set forth in the trial judge's written decision and, after a four-day trial, defendant was convicted of unlawful possession of a weapon, but acquitted of obstruction. Following this verdict, defendant pleaded guilty to being a person prohibited from possessing a weapon in violation of N.J.S.A. 2C:39-7(b).
Defendant was sentenced to a nine-year term of imprisonment with a five-year period of parole ineligibility on the conviction for being a person prohibited from possessing a weapon. The judge also imposed a concurrent four-year term on defendant's conviction for unlawful possession of a weapon. Separate judgments of conviction were entered on June 27, 2003.
Defendant appealed, raising the following arguments for our consideration:
I. THE COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS.
A. OFFICER McRAE'S ENCOUNTER WITH THE DEFENDANT CONSTITUTED A DE FACTO ARREST AND NOT AN INVESTIGATORY STOP.
B. OFFICER McRAE DID NOT HAVE PROBABLE CAUSE TO MAKE A DE FACTO ARREST OF THE DEFENDANT.
C. SINCE THE DE FACTO ARREST OF THE DEFENDANT WAS ILLEGAL THE SUBSEQUENT SEIZURE OF THE HANDGUN AND ARREST OF THE DEFENDANT SHOULD BE SUPPRESSED AS BEING THE "FRUIT OF THE POISONOUS TREE."
II. THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS CHARGE TO THE JURY.
A. THE TRIAL COURT'S INSTRUCTIONS TO THE JURY AS TO THE STIPULATION ENTERED BY THE DEFENSE CONSTITUTED PLAIN ERROR BECAUSE THE JURY WAS DIRECTED TO ACCEPT THE STIPULATION.
B. THE TRIAL COURT COMMITTED PLAIN ERROR BY DIRECTING THE JURY TO CONSIDER THE DEFENDANT'S "GUILT OR INNOCENCE."
III. THE NINE (9) YEAR BASE TERM IMPOSED ON THE DEFENDANT'S CONVICTION FOR BEING A PERSON WHO IS PROHIBITED FROM POSSESSING A HANDGUN WAS MANIFESTLY EXCESSIVE AND ILLEGAL.
A. THE TRIAL COURT ABUSED ITS DISCRETION IN IMPOSING A SENTENCE IN EXCESS OF THE PRESUMPTIVE SENTENCE FOR A CRIME OF THE SECOND DEGREE.
B. IMPOSITION OF A SENTENCE IN EXCESS OF THE PRESUMPTIVE SEVEN (7) YEAR SENTENCE FOR A SECOND DEGREE CRIME VIOLATED DEFENDANT'S CONSTITUTIONAL RIGHTS AS ARTICULATED BY *194 THE UNITED STATES SUPREME COURT IN BLAKELY V. WASHINGTON.

Because we agree that the judge mistakenly denied the motion to suppress, we need not reach defendant's arguments regarding the trial and the sentences imposed.

II
At the pretrial hearing regarding defendant's motion to suppress, Officer Paul McRae testified that, at approximately 2:15 a.m. on March 26, 2002, he and his partner[1] were in a marked patrol car in an area of Elizabeth "plagued with drug activity, people carrying weapons, things of that sort," and that they were sent to 1025 Flora Street because a caller had advised of "a black male wearing a black jacket ... selling drugs in that area." The judge asked Officer McRae for further details about this tip, but the officer had no further detail to provide:
THE COURT: Was that description anything other than  any age of the black male?
THE WITNESS: Unfortunately, we weren't given anything more specific than that.
THE COURT: Just a black male?
THE WITNESS: Yes, Sir.
When Office McRae arrived in that area, he "saw two persons matching that description." The two men, in Officer McRae's words, were "just standing there"; neither man was doing "anything suspicious" and neither was "engaged in any sort of drug activity." As he further explained:
Q. [D]id you, in fact, see [defendant] hand any narcotics to anyone at that point?
A. I did not.
Q. [I]n fact, you didn't see him handing or receiving money from anyone?
A. I did not.
Q. You, in fact, didn't see him engage in any hand-to-hand conversation [sic] with the other gentleman who walked away, did you?
A. No, sir.
Officer McRae then described what followed after he made these observations:
Q. ... And what did you do next? Who did you approach?
A. The gentleman that walked away simply did so. [Defendant] was apparently shocked and unnerved by our presence, so we stepped out of the car and began to try to interview him.
....
Q. ... Now why didn't you pursue the individual that had walked away?
A. He didn't do anything that we perceived to be suspicious. He didn't commit any crimes in our presence. He just walked away.
Q. Okay. So you approached [defendant], and what happened next?
A. Because of the area that it is, and we know it to be a violent area, the house, you know, that hour of the night.... I asked [defendant] to place his hands on top of his head so that my partner and I could pat him down for our safety.
Q. Okay. And why did you do that?
A. That's our common practice when we believe that we may be in danger, one of us will secure the prisoner's hands behind his head in this fashion, while the other officer pats him down.
While Officer McRae stated that he and his partner first attempted to "interview" defendant, the judge found only that the *195 officers were concerned for their safety[2] and, because of that concern, immediately commanded defendant to "place his hands on top of his head" so the officers could pat him down.
According to Officer McRae, defendant fled as he and his partner attempted to "secure him." After a chase of 100 feet,[3] the officers caught up with defendant, placed him in handcuffs, and patted him down. A handgun was then found in defendant's waistband.
To summarize, the evidence that formed the basis for the judge's denial of defendant's motion to suppress revealed that the police had received an anonymous tip that a black male in a black jacket was selling drugs in the area of 1025 Flora Street; that the arresting officer considered this to be a high crime area; that, in arriving at that location, the officers observed, as the motion judge found in his written opinion, "two individuals [who] fit the description," one of whom walked away[4]; that the officers did not observe any criminal or even suspicious activity until approaching defendant, who then appeared, in the motion judge's words, "shocked and nervous" as a result of "the officers' presence"[5]; and that the officers never saw a handgun or a bulge under defendant's clothing that might have suggested possession of a weapon until the gun was found in defendant's waistband after his apprehension. Based upon this information, the officers concluded that a Terry[6] frisk was necessary for their protection. In the course of this stop, defendant fled, was quickly apprehended and, while being patted down, was found to have a handgun in his possession  something the anonymous tipster did not predict.

III
We, of course, defer to the trial judge's findings of fact, State v. Locurto, 157 N.J. 463, 472, 724 A.2d 234 (1999), although we observe that the facts were not disputed and, indeed, defendant was content to argue that the State's version of what occurred did not justify his seizure or the following search. In considering the sufficiency of the officers' actions in this case, we must initially identify the type of police encounter that took place. Once defined, we then must consider whether the officers had sufficient cause to engage that particular warrantless search.

*196 A
Warrantless searches and seizures are presumptively invalid as contrary to the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution. State v. Cooke, 163 N.J. 657, 664, 751 A.2d 92 (2000); State v. Patino, 83 N.J. 1, 7, 414 A.2d 1327 (1980). When no warrant is sought, as here, the State has the burden of demonstrating that the search falls within "one of the few well-delineated exceptions to the warrant requirement." State v. Maryland, 167 N.J. 471, 482, 771 A.2d 1220 (2001). The three constitutionally permissible forms of warrantless police encounters with citizens are (1) the encounter occasioned by probable cause, (2) the investigatory stop, and (3) the field inquiry. State v. Pineiro, 181 N.J. 13, 20, 853 A.2d 887 (2004).
The encounter based upon probable cause requires "a well-grounded suspicion." State v. Sullivan, 169 N.J. 204, 211, 777 A.2d 60 (2001). Probable cause "exists where the facts and circumstances" based upon "reasonably trustworthy information" is sufficient "to warrant a [person] of reasonable caution" to believe that "an offense has been or is being committed." Schneider v. Simonini, 163 N.J. 336, 361, 749 A.2d 336 (2000), cert. denied, 531 U.S. 1146, 121 S.Ct. 1083, 148 L.Ed.2d 959 (2001).
The investigatory stop, sometimes referred to as a Terry stop, is valid if "based on specific and articulable facts which, taken together with rational inferences from those facts, give rise to a reasonable suspicion of criminal activity." State v. Nishina, 175 N.J. 502, 510-11, 816 A.2d 153 (2003). The suspicion "need not rise to the `probable cause necessary to justify an arrest.'" Pineiro, supra, 181 N.J. at 20, 853 A.2d 887 (quoting Nishina, supra, 175 N.J. at 511, 816 A.2d 153).
The field inquiry is "the least intrusive" constitutionally permissible encounter. Pineiro, supra, 181 N.J. at 20, 853 A.2d 887. It occurs "when a police officer approaches an individual and asks `if [the person] is willing to answer some questions,'" and is permissible "so long as the questions [are] not harassing, overbearing, or accusatory in nature." Ibid. (quoting Nishina, supra, 175 N.J. at 510, 816 A.2d 153). When subjected to a field inquiry, a person "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." Maryland, supra, 167 N.J. at 483, 771 A.2d 1220 (quoting Florida v. Royer, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229, 236 (1983)). For that reason, such an encounter is only constitutionally legitimate if the individual's movement or ability to leave are not restricted.
The State has not argued that the officers had probable cause to arrest defendant when initially encountered, and the manner in which the officers approached defendant was not consistent with a field inquiry because they immediately attempted to restrict his ability to leave and commanded that he place his hands on top of his head. Thus, our task is to determine whether the evidence presented adequately supports the officers' claim that a reasonable and articulable suspicion of criminal activity existed when they seized defendant.

B
The only evidence the officers possessed when they initially sought to frisk defendant was the anonymous tipster's assertion that a black man wearing a black jacket was selling drugs; the nature of the neighborhood; the hour of the day; the *197 probability, suggested by Officer McRae's experience, that a drug dealer in this area would likely be armed; and defendant's apparent nervousness. Accepting the accuracy of the judge's findings, and viewing these circumstances both individually and collectively, we conclude that the officers did not possess sufficient evidence or indicia of criminal activity to conduct an investigatory stop.

1. The Neighborhood and The Hour
The State emphasizes Officer McRae's belief that this was a high crime neighborhood as well as the fact that the encounter took place at a very late hour. Indeed, while such external factors may justifiably elevate an officer's suspicions, neither a neighborhood's notoriety nor the lateness of the hour represents a talisman for justifying a seizure of a citizen without other evidence. See Brown v. Texas, 443 U.S. 47, 51-52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357, 362-63 (1979); State v. Valentine, 134 N.J. 536, 547, 636 A.2d 505 (1994); State v. L.F., 316 N.J.Super. 174, 176-79, 719 A.2d 1272 (App.Div.1998). Indeed, if either our federal or state constitutions were to be so interpreted, the police would be provided with a license to stop and frisk anyone for any reason when found in certain places at certain hours. The time and place of a police encounter may elevate the suspicion required, but cannot, standing alone, justify an investigatory stop.

2. The Anonymous Tip
Unless provided by the anonymous tip, the officers had no information upon which to reasonably suspect defendant of criminal activity. The record is clear that if the officers had merely observed defendant and the other individual in the course of patrolling the neighborhood, they would have had no reason to make an investigatory stop, since they personally observed nothing indicative of wrongdoing. Accordingly, our focus turns to the tip  its content, its source, and the extent to which it was, or was not, corroborated by the officers' independent observations.
Our Supreme Court, in State v. Rodriguez, 172 N.J. 117, 127-28, 796 A.2d 857 (2002), thoroughly discussed the extent to which a police officer's actions may be justified by an anonymous tip:
An anonymous tip, standing alone, is rarely sufficient to establish a reasonable articulable suspicion of criminal activity. Alabama v. White, 496 U.S. 325, 329, 110 S.Ct. 2412, 110 L.Ed.2d 301, 308 (1990). The United States Supreme Court has warned that the "veracity of persons supplying anonymous tips is `by hypothesis largely unknown, and unknowable.'" Ibid. (quoting Illinois v. Gates, 462 U.S. 213, 237, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983)). The Court also has instructed that an informant's "veracity," "reliability," and "basis of knowledge" are "relevant in determining the value of his report." Id. at 328, 110 S.Ct. at 2415, 110 L.Ed.2d at 308 (citations and quotation marks omitted). To justify action based on an anonymous tip, the police in the typical case must verify that the tip is reliable by some independent corroborative effort. Id. at 329-30, 110 S.Ct. at 2415-16, 110 L.Ed.2d at 309.
Generally, "if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." Id. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309. Stated differently, courts have found no constitutional violation when there has been "independent corroboration by the police of significant aspects of the informer's predictions[.]" Id. at *198 332, 110 S.Ct. at 2417, 110 L.Ed.2d at 310. The analysis in any given case turns ultimately on the totality of the circumstances. Id. at 330, 110 S.Ct. at 2416, 110 L.Ed.2d at 309.
As will be seen, in ascertaining the reliability of an anonymous tip, although corroboration of the tip's identification of the subject and his location is important, the principal emphasis rests upon the extent to which there is corroboration of the tip's accuracy about the subject's involvement in criminal activity. In comparing the facts of this case against this standard, we first consider the tip's meager content, and conclude that it lacks the specificity of even those tips regarding a suspect's identity found inadequate in cases such as Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) and State v. Rodriguez, supra, 172 N.J. 117, 796 A.2d 857.
The anonymous tip in Florida v. J.L. indicated that a young black male was standing at a certain bus stop, wearing a plaid shirt and carrying a gun. 529 U.S. at 268, 120 S.Ct. at 1377, 146 L.Ed.2d at 258-59. Upon arriving at the bus stop, the police observed three black males "just hanging out," one of whom (the defendant) was wearing a plaid shirt. The Supreme Court unanimously agreed that the tipster's information was insufficient to support the Terry frisk that uncovered a handgun in defendant's possession. In speaking for the Court, Justice Ginsburg wrote:
The anonymous call concerning [the defendant] provided no predictive information and therefore left the police without the means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [defendant] of engaging in unlawful conduct. The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant].
[Id. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260-61.]
Here, the tipster was only correct about the fact that a black man wearing a black jacket was in the vicinity of 1025 Flora Street. Thus, like Florida v. J.L., the tipster provided an "accurate description of a subject's readily observable location and appearance." Id. at 272, 120 S.Ct. at 1379, 146 L.Ed.2d at 261. However, as the Court also observed, such a prediction is reliable only in a "limited sense," in that it identifies only "the person whom the tipster means to accuse." Ibid. Confirmation of that much of the tip does not demonstrate "that the tipster has knowledge of concealed criminal activity." Ibid. The reasonable suspicion at issue, as the Court in Florida v. J.L. emphasized, "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Ibid. (emphasis added). Similarly, there is a particular unreliability about the anonymous tip in the case at hand, because it only accurately described the subject's "readily observable location and appearance," ibid., which could just as easily have been ascertained by a nearby resident whose rest during the early morning hours was disturbed by defendant's presence outside.
Our Supreme Court, in State v. Rodriguez, found inadequate a tip of even greater specificity regarding location and identity than that considered in Florida v. J.L. In Rodriguez, an anonymous caller advised *199 a transit police officer that two men  "a thin, Hispanic male, about five feet, ten inches tall, wearing white shorts, a white tee shirt, and gold-rimmed glasses" and "a white, heavyset male, six feet tall, with a receding hairline and mustache, wearing a black tank top and dark shorts"  had left Ocean City to go to Philadelphia to purchase drugs, and would be arriving later that same day, by bus, in Atlantic City. 172 N.J. at 121-22, 796 A.2d 857. In fact, two men fitting those descriptions disembarked from a bus in Atlantic City and were subsequently seized by police. In relying upon Florida v. J.L., the Court concluded there was insufficient evidence to support an investigatory stop, stating:
The informant accurately described the appearance of defendant [and the other man], and correctly predicted their location at the bus terminal. We cannot reasonably conclude, based on those benign elements of the informant's tip, that the tip itself was "reliable in its assertion of illegality." [Florida v. J.L., supra, 529 U.S. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260-61.] In respect of that aspect of the tip most critical to the analysis, namely, that defendant would be engaged in drug trafficking, the informant provided no explanation of how or why he arrived at that conclusion. In fact, the only portion of the tip corroborated by the officers pertained to the innocent details of defendant's appearance at the bus terminal. Without more, the tip is insufficient to justify the detention under Terry and our analogous case law.
[172 N.J. at 131, 796 A.2d 857.]
In the case at hand, the anonymous caller's description of defendant's identity contained even less detail than the tips found inadequate in Florida v. J.L. and State v. Rodriguez. Moreover, although a tipster's information regarding identity and location are less probative than the tipster's purported knowledge of criminal activity, it is noteworthy that the tipster's description of the subject was so unremarkable that, upon their arrival at 1025 Flora Street, the officers found not one but two men, both of whom fit the caller's description.
But, Florida v. J.L. and State v. Rodriguez demonstrate that the tipster's information regarding criminal activity is far more important than what the Court in Rodriguez referred to as the tip's "benign elements" of the actor's identity or location. 172 N.J. at 131, 796 A.2d 857. In the matter at hand, we initially observe that the tipster provided no information to support his belief that defendant was engaged in selling drugs  an omission that should have caused the officers to consider the tipster's information with more than a little healthy skepticism about its reliability. Furthermore, the tipster's assertion that the subject was selling drugs was never corroborated to any extent.
That is, unlike what the police ultimately learned in both Florida v. J.L. and Rodriguez, the officers' subsequent observations and investigation provided no corroboration of the tipster's claim that the person described was selling drugs. Officer McRae testified that the conduct of the two individuals observed in front of 1025 Flora Street was unremarkable and certainly did not suggest they were involved in a drug transaction or any other criminal activity. He saw only these two individuals together and, upon their arrival, the departure of one. The officer observed no hand-to-hand transaction and acknowledged that neither defendant nor the other man acted in any suspicious way.
Indeed, even if relevant, we note that the officers found no corroborative evidence after defendant's apprehension. The officers' eventual search of defendant *200 turned up no drugs or any other indicia that might have suggested defendant was selling drugs. Instead, defendant was found to have in his possession a handgun  a fact the tipster did not forecast.[7] Thus, there was no corroboration of the tipster's prediction of drug trafficking even if we were to assume, contrary to law, that the end product of the search could provide justification for the seizure. See, e.g., Florida v. J.L., supra, 529 U.S. at 271, 120 S.Ct. at 1379, 146 L.Ed.2d at 260-61 ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); United States v. Sharpe, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605, 613 (1985) (A reviewing court must inquire "whether the officer's action was justified at its inception."); State v. Thomas, 110 N.J. 673, 678, 542 A.2d 912 (1988) ("The first component of the Terry rule concerns the level of reasonable suspicion that must exist before an `investigatory stop' legitimately may be undertaken."). Consequently, to the extent it was reliable, the tip was reliable only in its prediction that a black man in a black jacket was then near 1025 Flora Street. Because this information concerned only the identity and location of the subject, the tip was of little worth. As to the more important forecast of criminality, the tip was utterly unreliable since there was no corroboration either before or after defendant's apprehension that defendant had engaged in drug dealing. Accordingly, the evidence could not support a finding that the tip provided sufficient data from which a reasonable, articulable suspicion could be formed when the officers approached defendant and attempted an investigatory stop.

3. Nervousness and Flight
We also consider the fact that, in the motion judge's words, defendant appeared "shocked and nervous" to Officer McRae when he and his partner approached. This is yet another circumstance which, standing alone, cannot justify an investigatory stop. As explained by our Supreme Court in State v. Tucker, supra, 136 N.J. at 169, 642 A.2d 401, that "some city residents may not feel entirely comfortable in the presence of some, if not all, police is regrettable but true." In State v. Lund, 119 N.J. 35, 48, 573 A.2d 1376 (1990), the Court recognized, in quoting from Justice Stein's dissent in State v. Palacio, 111 N.J. 543, 558, 545 A.2d 764 (1988), that "the presence of police officers tends to make most people somewhat apprehensive." As a result, it has been held that "mere nervous or furtive gestures are insufficient, standing alone, to rise to the level of an articulable suspicion." State v. Stovall, 170 N.J. 346, 380, 788 A.2d 746 (2002). In short, anxiety or nervousness in the face of approaching police officers can be common among the innocent and cannot alone betoken criminal activity or justify a reasonable suspicion that an anxious or nervous person had or was engaged in criminal activity.
In a similar sense, no weight should be given to defendant's flight. State v. Tucker, supra, 136 N.J. at 170, 642 A.2d 401; State v. Dangerfield, 339 *201 N.J.Super. 229, 236-37, 771 A.2d 642 (App.Div.2001), aff'd, 171 N.J. 446, 795 A.2d 250 (2002); State in Interest of C.B., 315 N.J.Super. 567, 575, 719 A.2d 206 (App.Div.1998). Defendant did not attempt to flee until after the officers began their Terry frisk. Thus, his flight could not be considered as a fact that would justify the investigatory stop at its inception. Indeed, even a suspect's flight prior to encountering police is not alone sufficient to justify an investigatory stop. Tucker, supra, 136 N.J. at 170, 642 A.2d 401.

4. Summary
We recognize that courts must not limit their examination to a dissection of each circumstance offered as justification for an investigatory stop but, instead, should look at "the totality of the circumstances  the whole picture." State v. Thomas, supra, 110 N.J. at 678, 542 A.2d 912 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981)); see also State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986). We have analyzed each of the circumstances offered by the State and found them wanting. In considering these circumstances on the whole our view does not change. The officers possessed no information  viewed either separately or collectively  that could legitimately support the trial judge's finding of a reasonable, articulable suspicion that defendant had or was engaging in criminal activity. No matter how many zeroes are added to zero, the sum remains the same.

IV
The State urged an alternative tack by attempting to justify the search as incidental to a lawful arrest. That is, the State argues that the search which produced the handgun could be viewed as having been generated by defendant's arrest for obstruction in violation of N.J.S.A. 2C:29-1(a). The State claims this statute was violated when defendant fled from the investigatory stop. The judge agreed and concluded that this arrest was lawful and justified the search that followed. We reject this. A citizen's reaction to an unlawful search and seizure may not be criminalized when exercised in a peaceful manner.
N.J.S.A. 2C:29-1(a), which formed the basis for defendant's arrest, states in part that "[a] person commits an offense if he purposely... prevents or attempts to prevent a public servant from lawfully performing an official function by," among other means, "flight." As a result of its broadly-worded scope, this statute presents the possibility that a citizen could be charged with an offense by exercising the right to be free of an unreasonable search and seizure. For example, in this case, had the officers attempted to engage in a field inquiry and had they asked defendant if he was willing to answer their inquiries  which is all that their information and observations lawfully permitted  then defendant could have refused to speak with the officers and lawfully departed. See Florida v. Royer, supra, 460 U.S. at 497-98, 103 S.Ct. at 1324, 75 L.Ed.2d at 236; State v. Maryland, supra, 167 N.J. at 483, 771 A.2d 1220. Flight from a field inquiry  even though technically violative of N.J.S.A. 2C:29-1(a)  cannot be constitutionally criminalized.
For similar reasons, we conclude that an individual cannot be lawfully arrested for violating N.J.S.A. 2C:29-1(a) by fleeing from an unlawful Terry stop. Holding otherwise would criminalize the exercise of the constitutional right to refuse to participate in the State's unlawful exercise of dominion over an individual's right to be free of an unreasonable search and seizure. Not even in good faith, as we assume here, could the police officers generate *202 the circumstances upon which they might later base a charge of obstruction, in violation of N.J.S.A. 2C:29-1(a), by conducting an unlawful investigatory stop that caused an individual to flee.[8]
We similarly observed in State v. Rice, 251 N.J.Super. 136, 141, 597 A.2d 555 (App.Div.1991) the "anomaly inherent in allowing the assertion of a constitutional right to provide the basis for [the] abrogation of that right." By the very act of exercising his constitutional right to refuse to participate in an unlawful investigatory stop, defendant could not be deemed to have created the circumstances that would criminalize his conduct and cause the forfeiture of the very rights he sought to exercise. Accord Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441, 453 (1963); State v. Rice, supra, 251 N.J.Super. 136, 597 A.2d 555; State v. Berlow, 284 N.J.Super. 356, 362-64, 665 A.2d 404 (Law Div.1995). We adhere to the sentiments forcefully expressed in United States v. Prescott, 581 F.2d 1343, 1350 (9th Cir.1978), where the court held that an individual "is not required to surrender his Fourth Amendment protection on the say so of the officer. The Amendment gives him a constitutional right to refuse to consent.... His asserting it cannot be a crime." See also Camara v. Municipal Court, 387 U.S. 523, 532-33, 87 S.Ct. 1727, 1732-33, 18 L.Ed.2d 930, 937-38 (1967); Miller v. United States, 230 F.2d 486, 490 (5th Cir.1956); Tompkins v. Superior Court, 59 Cal.2d 65, 27 Cal.Rptr. 889, 378 P.2d 113, 115 (1963).
Our holding in this regard is limited to the facts presented. We by no means suggest the unlawfulness of a search incidental to an arrest that arises from subsequent criminal conduct having a "high potential for causing injury to law enforcement officials." State v. Casimono, 250 N.J.Super. 173, 185, 593 A.2d 827 (App.Div.1991), certif. denied, 127 N.J. 558, 606 A.2d 370, cert. denied, 504 U.S. 924, 112 S.Ct. 1978, 118 L.Ed.2d 577 (1992). There, we held that the improper detention of an individual by the police did not warrant the exclusion of evidence of his resisting arrest in violation of N.J.S.A. 2C:29-3(b)(1), or hindering apprehension, in violation of N.J.S.A. 2C:29-2(a). 250 N.J.Super. at 182-85, 593 A.2d 827. In State v. Seymour, 289 N.J.Super. 80, 86-87, 672 A.2d 1273 (App.Div.1996), we held that even if police officers did not have a reasonable, articulable suspicion to stop a vehicle, defendant's eluding of the police at a high rate of speed, in violation of N.J.S.A. 2C:29-2(b), purged the taint of any earlier unconstitutional action by the police. And, in State v. Lee, 381 N.J.Super. 429, 437, 886 A.2d 1066 (App.Div.2005), the majority concluded that, even though the police stop was unlawful because it was based upon racial profiling, the defendants' "anti-social acts," which included "resistive and threatening conduct," had broken the chain of events that followed the officers' unlawful stop and justified the use of the evidence thereafter obtained. See generally State v. Badessa, 185 N.J. 303, 314-15, 885 A.2d 430 (2005). Unlike the circumstances in these cases, defendant's flight from this unlawful investigatory stop did not create a danger to the officers and, thus, did not produce the element necessary to purge the taint of the officers' unlawful search and seizure. Accord State v. Badessa, supra, 185 N.J. at 314-15, 885 A.2d 430.
Accordingly, we distinguish the facts of the matter at hand from Casimono, *203 Seymour, and Lee, and conclude that defendant could not be lawfully arrested for fleeing from an unlawful investigatory stop in a manner that did not have, as Judge Skillman explained in Casimono, a "high potential for causing injury to law enforcement officials." 250 N.J.Super. at 185, 593 A.2d 827. Since defendant could not be lawfully arrested for obstruction, the ensuing search cannot be justified as incidental to that arrest.

V
The order denying defendant's motion to suppress evidence is reversed and the trial judge is directed to enter an order suppressing the evidence obtained as a result of the search in question. The judgments of conviction must also be reversed and the matters remanded for further proceedings in conformity with this opinion. We do not retain jurisdiction.
NOTES
[1] Officer McRae's partner did not testify.
[2] The judge determined that this concern for their safety emanated from the fact that Officer McRae had made approximately 200 drug-related arrests during his nearly five years on the force, and "perhaps half of them" involved armed individuals.
[3] The motion judge mistakenly found that defendant was chased for 100 yards, whereas Officer McRae  the only witness at this hearing  defined the distance as 100 feet. We discern no significance to this discrepancy between the evidence and the judge's findings.
[4] It strikes us as curious that the officers  in observing two men who fit the description given by the anonymous tipster  were not persuaded to question whether the subject of the tip was he who departed and not he who remained. The officers apparently assumed, for reasons not revealed by Officer McRae's testimony, that the person described by the tipster was he who stayed when they approached.
[5] The judge's finding in this regard was consistent with Officer McRae's testimony that defendant "was apparently shocked and unnerved by our presence." It is interesting to observe that Officer McRae did not describe what it was about defendant's appearance that caused him to draw that conclusion.
[6] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[7] As we observed in State v. Tucker, 265 N.J.Super. 358, 360, 627 A.2d 174 (App.Div.1993), aff'd, 136 N.J. 158, 642 A.2d 401 (1994), what the record does not show can also be "highly persuasive." Like Tucker, the record here did not disclose many things that might have, if present, altered the result: "no observed criminal activity; no particularized suspicious conduct, such as the possession of suspicious packages or the exchanging of money; no reports of recent nearby crimes; no descriptions of recent crime suspects; no nearby potential or [actual] victims of crimes; no nearby vehicle matching a description of a vehicle involved in a recent crime, or the like." Ibid.
[8] As observed earlier, although he was arrested, charged and tried for this conduct, the jury acquitted defendant of obstruction.